2003 ME 47

**State of MAINE**

v.

**David G. TREMBLAY.**

Supreme Judicial Court of Maine.

Argued: Feb. 12, 2003.
Decided: April 7, 2003.

Norman R. Croteau, District Attorney, Deborah P. Cashman, Asst. Dist. Atty. (orally), Auburn, for State.

Gregg D. Bernstein (orally), Lipman, Katz & McKee, P.A., Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

RUDMAN, J.

[¶ 1] David Tremblay appeals from judgments of conviction of two counts of gross sexual assault (Class A) in violation of 17–A M.R.S.A. § 253(1)(B) (Supp.2002)[1] entered in the Superior Court (Androscoggin County, *Gorman, J.*) following a jury trial. Tremblay asserts, *inter alia*, that the trial court committed reversible error when it

---

1. This section provides:

§ 253. **Gross sexual assault**

1. A person is guilty of gross sexual assault if that person engages in a sexual act with another person and:

. . . .

**B.** The other person, not the actor's spouse, has not in fact attained the age of 14 years.

17–A M.R.S.A. § 253(1)(B) (Supp.2002), *amended by* P.L.2001, ch. 383, § 14 (effective Jan. 31, 2003).

(1) refused, during deliberations, to disclose the contents of a note from the jury containing the jury's numeric breakdown before issuing a supplemental instruction, and (2) prevented him from cross-examining the complainant, his former stepdaughter (stepdaughter), regarding an abortion. We are not persuaded by Tremblay's arguments and affirm his conviction.

## I. BACKGROUND

[¶ 2] The State charged Tremblay with two counts of gross sexual assault against his stepdaughter. At trial, the stepdaughter testified about specific instances when Tremblay assaulted her, and to a general pattern of sexual activity involving the two between 1997 and 2000.

[¶ 3] After closing arguments, the jury began its deliberations at 11:08 A.M. At approximately 4:10 P.M., the jury sent the court a note indicating that it had reached a standstill.[2] The court read to counsel a portion of the note, which stated "little movement need instructions to proceed," but declined to read the remainder of the note aloud because the jury had included its numeric breakdown.[3] The court did, however, inform counsel that the note contained a number of votes for guilty and not guilty, as well as a number of jurors still undecided.

[¶ 4] The parties preliminarily discussed the fact that the jury volunteered its division. Tremblay immediately asked the court to disclose the tally, but the court declined to do so because, the court stated, the jury was not supposed to provide such information during deliberations, and, therefore, counsel was not entitled to know the vote.

[¶ 5] The parties then discussed how the court should respond to the jury's request for further instructions. Tremblay urged the court to declare a mistrial if the jury could not reach a verdict by the end of the day.[4] He suggested the court tell the jury to try to reach a verdict, but to continue deliberating only if they believed further deliberations would be productive.

[¶ 6] The court ultimately assembled the jury and gave the following supplemental charge:

Okay. Ladies and gentlemen, Mr. Beliveau sent a note in to me indicating that there was little movement in your deliberations and he asked for instructions on how to proceed. He also indicated to me what the count is. I will tell you now that if you send in another note, don't tell me what the count is. We are not supposed to have that information.

This was a difficult case and we all appreciate that and I know that it probably seems like you have been deliberating a long time, but I will tell you quite frankly that five hours isn't a particularly long time for this kind of case. It sometimes takes a considerable amount

---

2. This was the second note from the jury to the court after deliberations began. The jury had previously sent a note requesting a written definition of "reasonable doubt," which the court submitted after conferring with counsel.

3. The note revealed the jury was divided as follows: on count 1, eight jurors voted guilty, one not guilty, and three were undecided; on count 2, four jurors voted guilty, six voted not guilty, and two were undecided.

4. The court had not inquired into whether the jury would be available on the following day. Tremblay was concerned that, if a juror had a prior commitment and learned that the jury would have to return the next day, the juror might "just give up" to reach a verdict. In addition, Tremblay was concerned that an impending winter storm might also unduly pressure the jury into reaching a verdict.

of time for a jury to make its decisions because there are twelve people, all of whom may have very different views, and it does sometimes take awhile for all of those views to be heard.

I will also let you know, in case this is an issue, that if any one of you find that—if you believe that having any of the instructions or any of the testimony read back, if there is some questions [sic] among you about what someone said or what the instructions were, we can arrange to have those things read back to you.

But, I am not prepared to determine that you are deadlocked yet. I think that you can—it is still possible for you to reach a verdict in this case. So, I am going to tell you what your options are and I am going to send you back into the jury room so you may discuss those.

You may continue deliberating this evening for as long as or short a period as you like. You may also decide that you want to go home this evening, get a good night sleep and come back tomorrow morning and start fresh on your deliberations. And again, if that's what you decide to do and you want to have something read back to you at that time, Tammy can spend her evening going through her computer so she can find whatever it is that you think would be helpful.

So, at this time I am going to send you back into the jury room and ask you to seriously consult with one another with an effort to determine whether further deliberations would in fact be fruitful and if you believe it would be fruitful, perhaps not immediately, I would ask you to then let us know whether you want to continue your deliberations this evening or whether you want to take a break and come back tomorrow.

If you are certain that further deliberations would not be fruitful, again you may send another note in through Yvonne and I will bring you back in to speak with you at that time, but I would ask you to keep in mind this is a serious case, these are serious charges, and you have not spent an extraordinary long period of time thinking about them given the weight of the charges, how serious the charges are, and there are twelve of you who do need to discuss this.

[¶ 7] Neither party objected to the court's supplemental charge. The jury continued to deliberate after the court's instructions and thereafter requested two testimonial read backs. At 7:10 P.M., after nearly eight hours of deliberating, the jury returned guilty verdicts on both counts. Tremblay was sentenced to a sixteen-year-term of imprisonment, with all but ten years suspended.

[¶ 8] This appeal followed.

## II. DISCUSSION

### A. The Jury Note

1. Whether the court's failure to disclose the jury's numeric breakdown constitutes error.

[¶ 9] A criminal defendant has a fundamental right, protected by the Sixth Amendment to the United States Constitution, to attend all stages of the trial. *Faretta v. California*, 422 U.S. 806, 816, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("[T]he Confrontation Clause of the Sixth Amendment gives the accused a right to be present at all stages of the proceedings where fundamental fairness might be thwarted by his absence."). The Due Process Clause of the Fourteenth Amendment renders this constitutional principle applicable to the states. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *see also* ME. CONST. art. I, § 6;

*State v. White*, 285 A.2d 832, 835–36 (Me. 1972) (recognizing a defendant's right, in Maine, to attend every stage of the criminal trial except discussions outside the jury's presence concerning questions of law).

[¶ 10] Maine has codified the essence of this constitutional right in M.R.Crim. P. 43. *See State v. Pullen*, 266 A.2d 222, 227 (Me.1970) ("This rule ... serves to implement our constitutional provision and is merely declaratory of basic principles of our common law."), *overruled on other grounds by State v. Brewer*, 505 A.2d 774, 777 & n. 5 (Me.1985). The Rule provides, in relevant part, "[t]he defendant shall be present at the arraignment, at every stage of the trial including the impaneling of the jury, and the return of the verdict[.]" M.R.Crim. P. 43. The purpose of Rule 43 is to ensure that all defendants have the opportunity to (1) present evidence, (2) confront adverse witnesses, and (3) receive a fair and just trial. *See* 2 Cluchey & Seitzinger, *Maine Criminal Practice* § 43.2 at IX–9 (1995); *State v. Fernald*, 248 A.2d 754, 759 (Me.1968). Neither the constitutional right, nor Rule 43, however, demands the defendant's presence at all times.[5]

[¶ 11] The Supreme Court has interpreted the federal rule of criminal procedure 43(a)[6] to require a trial court to answer jury communications in open court, so that a defendant may be afforded an opportunity to be heard before the court implements a course of action. *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *see also State v. McCar-*

*thy*, 355 A.2d 923, 924 n. 2 (Me.1976) (noting the trial court appropriately advised counsel of a jury note in conformance with *Rogers*). The preferred method for handling such communications, as developed in the federal circuit courts of appeals, includes general adherence to the following steps: "(1) the jury's communiqué should be reduced to writing; (2) the note should be marked as an exhibit for identification; (3) it should be shown, or read fully, to counsel; ... (4) counsel should be given an opportunity to suggest an appropriate rejoinder[;]" and (5) the court should inform counsel of the substance of its response to the jury. *United States v. Maraj*, 947 F.2d 520, 525 & n. 7 (1st Cir.1991); *accord United States v. Ronder*, 639 F.2d 931, 934 (2d Cir.1981).

[¶ 12] In this case, we are asked to consider whether the defendant's right to be present includes the right to be informed of jury communications made to the court during deliberations, including those that improperly reveal the precise extent of the jury's division. The Superior Court erred by refusing to disclose the jury's preliminary vote on both counts of the State's gross sexual assault charge to counsel.

[¶ 13] Initially, we note that the court should not inquire into the jury's numerical standing and the trial court correctly told the jurors not to provide such information. *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926) ("Such procedure serves no useful purpose that cannot be attained by

5. We have stated, for example, that Rule 43 does not grant a defendant the right to attend all discussions regarding questions of law. *State v. White*, 285 A.2d 832, 835–36 (Me. 1972); 2 Cluchey & Seitzinger, *Maine Criminal Practice* § 43.2 at IX–9 (1995).

6. The federal rule is analogous to the Maine rule. *See* M.R.Crim. P. 43 reporter's note. The federal rule provides, in part, "[t]he defendant must be present at: (1) the initial appearance, the initial arraignment, and the plea; [and] (2) every trial stage, including jury impanelment and the return of the verdict ...." FED. R. CRIM. P. 43(a).

questions not requiring the jury to reveal the nature or extent of its division."). When the jury improperly volunteers its division, however, the court necessarily relies and acts upon such information in determining its subsequent course of action. *See United States v. Hotz*, 620 F.2d 5, 7 (1st Cir.1980). For this reason, the court must also apprise counsel so that counsel may "respond to the exigencies of the moment," *Maraj*, 947 F.2d at 526, and help the court craft a meaningful response to the jury's inquiry. The fact that the note, in this case, did not contain an inquiry into a substantive issue of fact or law, *e.g., People v. O'Rama*, 78 N.Y.2d 270, 574 N.Y.S.2d 159, 579 N.E.2d 189, 191 (1991),[7] or that the court informed counsel of the note's general substance and only failed to read a portion, *e.g., Maraj*, 947 F.2d at 525, is immaterial. Without knowledge of the jury's numerical split, Tremblay held less than all the facts disclosed to the court and, therefore, was not afforded an opportunity to be adequately heard before the court responded to the inquiry—a critical stage in the proceedings. *See Rogers*, 422 U.S. at 39, 95 S.Ct. 2091 (holding trial court committed prejudicial error when it answered a jury inquiry during deliberations without the defendant's knowledge or presence).

2. Whether the court's error was harmless

■ [¶ 14] A trial court's error in failing to reveal the existence or contents of a jury note to counsel does not require reversal if the error is harmless. *E.g., United States v. Parent*, 954 F.2d 23, 25 (1st Cir.1992); *see* 3A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 724, at 30 (2d ed.1982) (stating a rule that does

not require a showing of prejudice to the defendant "goes too far"). We note, however, that courts differ in their approach to applying a harmless error analysis in the context of communications between the jury and the court during deliberations.

■ [¶ 15] When evaluating whether a defendant suffered prejudice in this context, courts look to the nature of the jury's inquiry and the court's subsequent supplemental instruction. *See, e.g., United States v. Coffman*, 94 F.3d 330, 335–36 (7th Cir.1996) (observing the court's failure to inform counsel regarding the jury note, indicating impasse, before issuing a further instruction was harmless even though the instruction told the jury to keep deliberating); *United States v. Blackmon*, 839 F.2d 900, 915 (2d Cir.1988) (holding no prejudice to the defendant when the jury note informed the court "one juror cannot work past 6:30," the court gave an ex parte response urging the jury to continue deliberating, and the jury returned a guilty verdict within twenty-five minutes).

[¶ 16] Based on the facts of this case, regardless of whether the harmless error inquiry is conducted under the standard for constitutional deprivations, *see State v. Burdick*, 2001 ME 143, ¶ 29, 782 A.2d 319, 328 (stating the record must show, beyond a reasonable doubt, that the error did not affect substantial rights or contribute to the verdict obtained), or the less stringent standard for the majority of trial errors, *see State v. DeMass*, 2000 ME 4, ¶ 17, 743 A.2d 233, 237 (holding error is harmless "when it is highly probable that it did not affect the jury's verdict"), the Superior Court's error does not require vacating the conviction.

---

7. Although the *O'Rama* court interpreted a New York statute (N.Y. CRIM. PROC. LAW § 310.30 (2002)) that required the trial court to instruct the jury concerning an inquiry "after notice to both people and counsel for the defendant," 574 N.Y.S.2d 159, 579 N.E.2d at 191, the court's reasoning is nonetheless instructive for the present case.

[¶ 17] First, the jury note was not a request for clarification of law or further substantive instructions. *E.g., Parent,* 954 F.2d at 24 (holding the defendant was prejudiced when the court responded ex parte to jury's request to "visually review" court's previous instruction on "constructive possession"). Rather, the note indicated that the jury had reached a relative standstill in deliberations and needed further instructions on how to proceed in such circumstances. Thus, because this note was not a substantive inquiry into fact or law, the court's partial disclosure made Tremblay less susceptible to prejudice. *See Pennsylvania v. Bradley,* 501 Pa. 25, 459 A.2d 733, 734 (1983) (noting that instructions on the law or the law's application to the facts often create a higher risk of prejudice than more incidental communications).

[¶ 18] Second, the court disclosed the substance of the jury note to Tremblay and gave him an opportunity to suggest a response before issuing the supplemental instruction. Initially, we acknowledge that partial disclosure may not be sufficient to prevent a subsequent finding of prejudice to a defendant when the court issues a supplemental instruction urging a verdict. *E.g., O'Rama,* 574 N.Y.S.2d 159, 579 N.E.2d at 194 (holding the defendant was prejudiced when the court failed to read a portion of the jury note stating jury was split "6/6," told counsel the jury was experiencing "continued disagreements," and subsequently issued a supplemental instruction urging a verdict).

[¶ 19] Here, however, the court did not issue a "deadlock busting" instruction or otherwise urge the jury to return to the jury room to continue deliberating in the hope of reaching a verdict. Instead, the court instructed the jury to consult with one another *to determine if further deliberations that evening or the following*

*morning would be productive.* The court asked the jury to notify the court of its decision before they began deliberating. This instruction was within the bounds of the court's discretion because the court had to determine that the jury was genuinely deadlocked before it could declare a mistrial based on manifest necessity. *See* Alexander, *Maine Jury Instruction Manual* § 8–6 at 15 (4th ed.2001). Moreover, Tremblay did not object to the court's supplemental charge after it was issued, and could have objected when the jury requested testimonial read backs because it was apparent that they had decided to continue deliberating in violation of the court's instructions.

[¶ 20] Accordingly, on this record, the court's partial disclosure did not prejudice Tremblay and, therefore, the court's error was harmless.

B. Cross–Examination Regarding the Stepdaughter's Abortion

[¶ 21] Tremblay next challenges the Superior Court's ruling that prevented him from cross-examining the stepdaughter regarding her abortion.

[¶ 22] In November 2000, the stepdaughter told a caseworker from the Department of Human Services (DHS) that, in July 2000, she aborted a fetus resulting from a sexual relationship with a former boyfriend. She also told the caseworker that she had never become pregnant by Tremblay. At trial, however, the stepdaughter contradicted her previous statement to the caseworker and she testified that she had in fact become pregnant by Tremblay.

[¶ 23] Tremblay sought to admit evidence of the abortion and the attendant circumstances to impeach the stepdaughter's credibility. He argued, and reasserts on appeal, that the July 2000 abortion

would have occurred too late in the pregnancy for him to be the father if, as the stepdaughter alleged, the couple's last sexual encounter was in April 2000. He further asserts that cross-examination on the abortion issue was particularly relevant because the prosecution offered no physical evidence implicating Tremblay. Impeaching the stepdaughter's credibility was, therefore, vital to his defense.[8]

[¶ 24] We review the trial court's ruling limiting the scope of cross-examination for abuse of discretion. *State v. Nason,* 498 A.2d 252, 255 (Me.1985). Despite the trial court's significant discretion, however, it must not deprive a party of a reasonable opportunity to elicit impeaching testimony. Field & Murray, *Maine Evidence* § 611.2 at 303 (2000 ed.) (hereinafter Field & Murray at ___). We will uphold a trial court's ruling "unless it has clearly interfered with a defendant's right to a fair trial." *State v. White,* 456 A.2d 13, 15 (Me.1983).

[¶ 25] The court did not exceed the bounds of its discretion in preventing Tremblay from cross-examining the stepdaughter regarding her abortion. Neither the stepdaughter's abortion, nor conclusive evidence that Tremblay impregnated the stepdaughter was probative of whether Tremblay committed gross sexual assault. *Cf. State v. Stoddard,* 1997 ME 114, ¶ 15, 696 A.2d 423, 427 (holding the trial court did not abuse its discretion by excluding evidence of the defendant's willingness to take a blood test after his release from police custody because the test had limited probative value regarding his intoxication at the time of the accident).

[¶ 26] Although, as Tremblay asserts, the jury's verdict depended largely on

whether the jury believed Tremblay or the stepdaughter, the court gave Tremblay a reasonable opportunity to expose the jury to inconsistencies in the stepdaughter's testimony and flaws in her credibility. *See* Field & Murray at 303. After testifying that Tremblay was, in fact, the source of her pregnancy, the court allowed a line of questioning into the stepdaughter's sexual activity and the circumstances surrounding the pregnancy.

[¶ 27] During this questioning, the stepdaughter admitted beginning a sexual relationship with another man after her last alleged sexual encounter with Tremblay in April 2000. She also testified telling a clinician at a July 2000 medical appointment that her last menstrual period was "unsure/end of May." Finally, she acknowledged making the previous statement to a DHS caseworker that Tremblay was not the father of the aborted fetus. The attempted cross-examination into the abortion was, therefore, cumulative of evidence in the record undermining the stepdaughter's credibility. *See State v. DiPietro,* 420 A.2d 1233, 1235 (Me.1980) (holding the trial court did not abuse its discretion by restricting the defendant from cross-examining the prosecution's chief witness regarding his hostility for the defendant). Accordingly, the court acted within the bounds of its discretion.

[¶ 28] Tremblay's additional contentions are without merit and, therefore, we decline to address them.

The entry is:

Judgment affirmed.

---

8. Tremblay also contends that this issue was especially relevant in light of the stepdaughter's testimony that she and Tremblay had sexual relations on hundreds of occasions without birth control.