2004 ME 10

**STATE of Maine**

v.

**Robert ALLEY.**

Supreme Judicial Court of Maine.

Argued: Nov. 7, 2003.
Decided: Jan. 20, 2004.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Fernand R. LaRochelle, Asst. Attorney General, Augusta, for State.

Verne E. Paradie Jr. (orally), Trafton & Matzen, Auburn, George A. Hess, Auburn, for defendant.

Panel: SAUFLEY, C.J., and RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] Robert Alley appeals from a judgment of conviction entered in the Superior Court (Androscoggin County, *Studstrup, J.*) following a jury verdict finding him guilty of manslaughter (Class A) pursuant to 17–A M.R.S.A. § 203(1)(A) (Supp.2003). Alley contends that the court committed various errors, including: (1) denying his motion to suppress items seized without a warrant; (2) denying his motion to suppress statements he made to a detective during the investigation; and (3) allowing the State to cross-examine his expert witness after the State allegedly committed a discovery violation.[1] We disagree and affirm the judgment.

## I. CASE HISTORY

[¶ 2] At 8:06 A.M. on September 30, 2001, Robert Alley called 911 to report that his neighbor's dead body was on the floor of his apartment. When officers from the Auburn Police Department arrived at Alley's apartment, Alley was waiting outside wearing a sweatshirt and pants, both of which were bloodstained. The officers entered Alley's apartment and

---

1. Alley raises a variety of other issues, which we have determined to be without merit and do not address separately. They include: (1) allowing the State's medical examiner to testify to his conclusions pertaining to a footwear pattern on the victim's chest; (2) excluding evidence of alternative suspects' prior bad acts; (3) excluding alternative suspect evidence regarding the victim's roommate; (4) allowing the State's footwear analysis expert to testify and to use acetate sheets as illustrative evidence during her testimony; (5) denying Alley's request to depose alternative suspects; (6) admitting photographs of Alley wearing bloodstained clothing taken the day of the murder; (7) denying Alley's request for a mistrial and new trial; (8) denying Alley's request for a bill of particulars pertaining to the time of death; and (9) finding there was sufficient evidence to convict Alley of manslaughter.

discovered the victim lying on his back on the living room floor with blood on his face, hair, beard, and underneath his head. The victim died as a result of "blunt injuries," i.e., he was beaten to death. After examining the victim's body, paramedic Richard Theriault asked Alley what had happened. Alley responded that he and the victim had been drinking a lot and playing chess the night before, that Alley went to bed, and then he awoke in the morning to find the victim dead on his floor.

[¶ 3] Officer Stephen Gosselin asked Alley if he would voluntarily go to the Auburn Police Department for questioning and Alley agreed. While at the station, Alley was placed in a juvenile intake room and spoke with officers about the incident.[2] Alley was not placed under arrest. After approximately two hours, Alley requested that he be allowed to leave and was told that he could not leave until he gave the police his clothes. Detective Lopez noticed some long gray hairs stuck on Alley's pant legs that he recognized to be similar to the victim's hair. Without a warrant, Lopez removed the hairs and placed them in evidence envelopes.

[¶ 4] Alley requested to see his attorney, who was representing Alley in an unrelated matter, at the time he expressed his desire to leave the police station. Although Detective Lopez told Alley that the police would try to locate the attorney and would provide Alley with a phone book, the attorney was not located and Alley was not provided with a phone book or phone.

[¶ 5] Alley told the officers he would bring them his clothing and footwear after he returned to his apartment. The police refused this offer, and instead Detective Lopez left the station at approximately

11:50 A.M. to purchase a change of clothing for Alley. Lopez returned at approximately 12:40 P.M. Alley changed into the new clothing and the police took possession of his bloodstained clothing.

[¶ 6] Detectives Ferland and Fowler offered to give Alley a ride. They left the station at 2:35 P.M. and, at Alley's request, drove him first to a friend's residence, who was not at home, and then to Alley's sister's house, arriving at 3:15 P.M. Alley's sister was home and speaking on her phone at the time they arrived. The detectives did not ask Alley any questions during the drive due to Alley's earlier request to speak with his attorney. Alley did, however, tell the detectives that he had a court appearance the following morning on an unrelated matter and expected to see his attorney there. Later during the ride, Detective Ferland told Alley, "at some point the detectives are going to want to sit down with you. They are going to want to hear your side of the story."

[¶ 7] At approximately 8:30 that evening, Detectives Ferland and Fowler returned to the friend's house, assuming that Alley might be there, with the intention of questioning Alley further. They knocked on the door and were invited in by Alley's friend and a woman believed to be the friend's wife. Alley was present and he agreed to speak with Detective Ferland, who told Alley immediately that he was not under arrest. Ferland, for the first time, read Alley the *Miranda* warnings and obtained what he believed was an effective waiver of those rights.

[¶ 8] Alley told Detective Ferland that he drank and smoked marijuana with two friends the night of September 29, 2001;

---

2. The substance of the discussion between Alley and the officers was not established at the suppression hearing.

after his friends left, he drank and played chess with his upstairs neighbor, and then he blacked out. He stated that when he awoke the next morning, he discovered his upstairs neighbor's body on the floor, tried to wake him up, and discovered he was dead. Alley also told Ferland that he wiped the victim's face with a towel, threw the towel in either the sink or trash, and threw a hard object into the bushes outside his apartment. Alley said that he picked up the hard object from the floor, could not see what it was because he was not wearing his glasses, and did not even know why he picked it up. At that point he called 911.

[¶ 9] Alley was indicted on October 12, 2001, for intentional or knowing, or depraved indifference, murder in violation of 17-A M.R.S.A. § 201(1)(A) & (B) (Supp. 2003) and was arrested that day. Alley filed several pretrial motions, including motions to suppress evidence of his clothing and the hairs found on his clothing, and to suppress evidence of his oral statements made on September 30, 2001. The court denied all motions, with the exception of granting in part the motion to suppress as to any statements Alley made at the police station following his request for counsel.[3]

[¶ 10] Prior to trial, the State instructed its expert bloodstain witness, Herbert Leighton, to contact Alley's expert bloodstain witness, Ross Gardner, to inquire about the testing Gardner conducted on the victim's shirt and the results of those tests. Gardner told Leighton about the tests he performed and his conclusions.

[¶ 11] Alley's jury trial began on September 23, 2002. At trial, Alley called Gardner as an expert witness, but subsequently objected to the State's cross-examination of Gardner. He argued that the

State should not be allowed to question Gardner about information that Alley did not intend to introduce at trial and that the State acquired via Leighton's phone call because the communication constituted a discovery violation. The court overruled the objection and permitted the State to cross-examine Gardner on all aspects of his testing, including those Alley had not developed during his direct examination of Gardner.

[¶ 12] The jury returned a verdict finding Alley guilty of Class A manslaughter. Alley was sentenced to a term of imprisonment of eighteen years, with all but fourteen suspended. Following the court's denial of his motion for a new trial, Alley filed this appeal.

## II. DISCUSSION

### A. The Admission of Alley's Bloodstained Clothing and the Victim's Hairs

[¶ 13] Alley contends that the court erred by denying his motion to suppress the clothing and hairs that were seized at the police station because they were seized without a valid warrant or pursuant to a valid exception to the warrant requirement. We review a denial of a motion to suppress for errors of law or clearly erroneous findings of fact. *State v. Lockhart*, 2003 ME 108, ¶ 15, 830 A.2d 433, 441; *State v. Bridges*, 2003 ME 103, ¶ 24, 829 A.2d 247, 254. We will uphold the court's denial of a motion to suppress "if any reasonable view of the evidence supports the trial court's decision." *Bridges*, 2003 ME 103, ¶ 24, 829 A.2d at 254 (internal quotations omitted).

[¶ 14] The court denied Alley's motion to suppress, concluding that the warrantless seizures of Alley's clothing and the hairs

---

3. There was, however, no evidence presented at the suppression hearing of any questioning

or statements made at the police station after Alley requested counsel.

were justified based on exigent circumstances and the plain view doctrine. We agree that both of these exceptions to the warrant requirement apply and that suppression of the evidence was properly denied.

[¶ 15] Exigent circumstances exist when there is adequate probable cause for the seizure and insufficient time for the police to obtain a warrant. *State v. Schueler*, 488 A.2d 481, 483 n. 1 (Me.1985). The plain view doctrine permits police to seize an object without a warrant if they "are lawfully in a position from which they can view an object, its incriminating character is immediately apparent, and the officers have a lawful right of access to the object." *State v. Storey*, 1998 ME 161, ¶ 18, 713 A.2d 331, 335 (citing *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). Here, Alley contends that although the objects seized without a warrant were in plain view of the police, exigent circumstances did not exist because the officers could have obtained a warrant during the six-hour period he remained at the station.

[¶ 16] Alley's bloodstained clothes and the hairs on his sweatpants were observed by the police at a time when they had a right of access to view Alley because he was voluntarily at the police station. When Detective Lopez saw the hairs on Alley's pants, the detective's decision to immediately seize the hairs without a warrant was justified by the exigency that if he failed to seize the hairs, they could be lost or destroyed. *See Cupp v. Murphy*, 412 U.S. 291, 296, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (holding that the search and seizure of defendant's fingernail scrapings was constitutional because the defendant may have been trying to destroy the evidence while at the station); *State v. Leonard*, 2002 ME 125, ¶ 13, 802 A.2d 991, 994 (stating that exigent circum-

stances can exist when there is the potential for the loss or destruction of evidence).

[¶ 17] A similar threat of loss or destruction of evidence did not arise with respect to Alley's clothing until Alley refused to give his clothing to the police and told the police that he wanted to leave the police station. Only then did it become necessary to seize the bloodstained clothing so that it would not be lost or destroyed. Although Alley was not under arrest at that time, his subsequent detention without a warrant for approximately fifty minutes was necessary so that Detective Lopez could obtain a change of clothes for Alley. *See State v. Moulton*, 1997 ME 228, ¶ 10, 704 A.2d 361, 364 (finding that an investigatory detention of a person, short of an arrest, is valid if the law enforcement officers act on the basis of specific and articulable facts). This temporary detention was reasonable because the police had an articulable suspicion that a crime had been committed; observed, in plain view, that Alley was in possession of clothing that was evidence of the crime; and faced the exigency of needing to take immediate possession of Alley's clothing so that it would not be lost or destroyed as evidence, while also needing to obtain replacement clothes for Alley to wear. *See id.*; *Schueler*, 488 A.2d at 483 (holding that the boots that the defendant wore when he voluntarily went to the police station were lawfully seized pursuant to the plain view doctrine).

B. Statements Made During the Interrogation at Alley's Friend's House

[¶ 18] Alley contends that the court erred by denying his motion to suppress the statements he made to Detective Ferland on the evening of September 30, 2001, because Alley had invoked his right to counsel earlier that day. He argues that the break in custody, from approximately

2:35 to 8:30 P.M., was pretextual and therefore could not terminate his earlier invocation of the right to counsel. Furthermore, Alley argues that he invoked his right to counsel again while at the friend's house, and Ferland violated this right by questioning Alley after this second invocation.

### 1. The Reinitiation of Interrogation Following a Break in Custody

[¶ 19] Alley was released from custody at approximately 2:35 P.M. when the detectives gave him a ride to his friend's house and then his sister's house. It was not until approximately six hours later that the detectives visited Alley. If a defendant invokes his or her right to counsel, interrogation must cease. *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Likewise, law enforcement officials cannot reinitiate interrogation at a later point in time when the defendant remains in custody. *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, if there is a break in custody, law enforcement officials may reinitiate interrogation in the absence of counsel as long as the defendant has had a reasonable opportunity to contact counsel. *E.g., Clark v. State*, 140 Md.App. 540, 781 A.2d 913, 941–42 (Ct. Spec.App.2001) (citing cases that recognize the break-in-custody exception to *Edwards*).

[¶ 20] During the ride to his friend's house, Alley told Detectives Ferland and Fowler that he was going to see his attorney in court the following morning regarding an unrelated matter. Neither Ferland nor Fowler said anything to Alley in response to this information. Rather, Ferland told Alley, "at some point the detectives are going to want to sit down with you. They going to want to hear your side of the story." Ferland testified that having learned that Alley expected to see his lawyer the next morning, "part of the [investigation] strategy was to speak with Mr. Alley that night knowing that he was going to court the next day and likely to speak to an attorney."

[¶ 21] The purpose of *Edwards*'s prophylactic rule is to give defendants who have invoked their right to counsel a reasonable opportunity to contact counsel before they may be subject to reinterrogation. *See Dunkins v. Thigpen*, 854 F.2d 394, 397 (11th Cir.1988). The totality of the circumstances surrounding the break in custody must be examined to determine whether the prophylactic purpose of *Edwards* was achieved. *See United States v. Bautista*, 145 F.3d 1140, 1150 (10th Cir. 1998) ("Whether a break in custody is sufficient to remove a suspect's request for counsel from the ambit of *Edwards* must be evaluated under the totality of the circumstances."). If a break in custody does not give the defendant a reasonable opportunity to contact counsel, then the break does not dissolve the protections afforded by *Edwards*. *See id.; People v. Storm*, 28 Cal.4th 1007, 124 Cal.Rptr.2d 110, 52 P.3d 52, 62, 63 (2002).[4]

[¶ 22] In this case, the record establishes that Alley had a reasonable op-

---

4. Although some courts have stated in dicta that a contrived or pretextual break in custody does not vitiate *Edwards* protection, we need not decide whether our analysis would change in the face of evidence of deliberate police misconduct because there is no such evidence here. *See Storm*, 124 Cal.Rptr.2d 110, 52 P.3d at 64 ("[D]efendant [was not] misled into a false sense of security. He knew he was the prime suspect, and the police said nothing to suggest he was permanently immune from further questioning.... [D]efendant acknowledged [the officer's] warning that the matter was not concluded.").

portunity to contact an attorney during the six-hour period following his release from custody. Alley does not point to any evidence adduced at the suppression hearing that suggests that his failure to contact an attorney during the six-hour break resulted from his reliance on statements by or the conduct of the detectives. The record provides little information regarding his activities during this period, other than establishing that he left his sister's residence to purchase cigarettes and eventually arrived at his friend's residence. The suppression court did not find, nor was it requested to find, whether there was a causal connection between the detectives' strategy to interview Alley before his court appearance the next day and Alley's failure to contact a lawyer during the six-hour break.[5] In the absence of a request for additional findings, we assume that the suppression court found all facts necessary to support its ruling.[6]

[¶ 23] We discern no basis to conclude that under the totality of circumstances, the government's strategizing prejudiced Alley's right to counsel for the sake of obtaining a waiver and confession. Because the six-hour break afforded Alley a reasonable opportunity to contact an attorney before the reinitiation of interrogation, there was no *Edwards* violation and the motion to suppress was properly denied.

### 2. Alley's Ambiguous Invocation of his Right to Counsel

[¶ 24] Alley does not contest that the interview at his friend's house was not custodial; the detectives were invited into the home, and Alley's friend was present during the interview. Detective Ferland began by telling Alley that he was not under arrest and was free to leave at any time, but that Ferland wanted to make sure that Alley understood his rights.

[¶ 25] After reading Alley each of the *Miranda* warnings, Ferland questioned Alley to determine whether he understood his rights. Ferland asked Alley if he understood what it means to have the right to remain silent, and Alley responded, "depends on how much trouble I'm in." Alley next told Ferland "it means that I don't have to say anything." Ferland asked Alley if he understood what it means that anything he says can be used against him in a court of law, and Alley responded, "[i]t means anything I say can be used against me. If I say it wrong, I guess." Ferland then responded, "Well, yeah. Yes and no. Basically, what it means is that any conversation that we have, if I'm called to court to testify, ah, I have to tell the judge and/or jury, ah, what our conversation was. You understand?" Alley responded, "Yeah."

---

**5.** For example, Alley would not have been given a reasonable opportunity to contact his attorney if: (1) the detectives had told Alley that they would not contact him until after he saw his attorney the following morning; (2) Alley did not contact his attorney because he relied on the statement; and (3) the detectives visited Alley six hours later. However, there was no evidence that indicated that the detectives' knowledge of Alley's court appearance the following morning had any effect on Alley's decision to not contact his attorney. *See, e.g., Storm*, 124 Cal.Rptr.2d 110, 52 P.3d at 64.

**6.** *E.g., State v. Izzo*, 623 A.2d 1277, 1280–81 (Me.1993) (upholding denial of suppression motion and stating that appellant has the burden to request that court expand on findings; in the absence of such a request, we assume the suppression court found all facts necessary to support its ruling); *State v. Powell*, 591 A.2d 1306, 1308 n. 4 (Me.1991) (upholding suppression order and noting that when the State fails to request findings of fact, we assume that the suppression court found all necessary facts to support the grant of the motion).

[¶ 26] Ferland next told Alley, "you have the absolute right to the advise [*sic*] of a lawyer before any questioning and to the presence of a lawyer here with you during questioning." Ferland asked Alley, "[d]o you understand what that means? What does that mean to you?" Alley first responded, "[i]t means I should wait for a lawyer." Ferland stated "that's not what it says. Ah, it says you have the absolute right . . . ," whereby Alley interrupted with "I, I have the right to have a lawyer. Yes, I know."

[¶ 27] Ferland told Alley, "if you cannot afford a lawyer . . . one will be furnished to you free before any questioning if you desire," and asked him, "[d]o you understand what that means?" Alley first responded, "Yes . . . [i]t means that I'm going to have to get a lawyer," and then responded, "[t]hat means I should wait until I see a lawyer." Ferland proceeded to give Alley a long explanation of the right to the advice of counsel before any questioning, stating, in part:

> This is your choice whether you talk to me or not, it's your choice . . . [y]ou have had the day to [contact an attorney] . . . [i]f you want to talk with an attorney and hire one, that's your right. Okay? But . . . you can also talk to me now . . . So, if you wish to talk to me now, I'm here to talk . . . if you want an attorney, that's fine, too. I'll get up and leave . . . .

Alley then began to tell Ferland his story, and Ferland interrupted him to say:

> I need a clear-cut answer. Cause I don't want to violate your rights. If you're willing to talk with me, then you need to say, okay, I'm willing to talk with you and I don't want to talk with an attorney now. And if you do want to talk with an attorney, I'll get up and leave. It's entirely up to you, but I need an answer either way.

Alley responded, "I'll talk to you." He then signed the *Miranda* card and spoke with Ferland about the incident.

[¶ 28] When a defendant ambiguously invokes his or her right to counsel, *Miranda* permits an officer to attempt to resolve the ambiguity by asking the defendant questions for clarification. *State v. Marden*, 673 A.2d 1304, 1310 (Me. 1996). Alley's invocation was ambiguous when he stated twice, "that means I should wait until I see a lawyer." However, after Detective Ferland continued to explain to Alley his right to decide whether to answer questions with or without counsel, Alley's response was not ambiguous. Ferland acted responsibly by clarifying Alley's rights, and asking Alley to unequivocally decide whether he wished to answer questions without the assistance of an attorney. The record establishes that Alley understood the rights and consequences of a waiver. *See Marden*, 673 A.2d at 1309 ("*Miranda* does not contemplate a ritualistic recital but rather, is directed to insuring that the substance of the constitutional rights of a person in custody be intelligibly conveyed to him.") (internal quotations omitted).

C. State's Pretrial Contact With the Defense Expert

[¶ 29] Alley argues that the State committed a discovery violation by having its bloodstain expert, Leighton, contact Alley's bloodstain expert, Gardner, before trial. Alley contends that the discovery rules do not allow the State to contact a defendant's expert witness and that the information obtained was protected work-product. Therefore, Alley argues, the court erred by allowing the State to cross-examine Gardner and elicit evidence that Alley contends he had no intention of introducing.

[¶ 30] We review a court's determination to allow or limit cross-examination for abuse of discretion and will uphold the court's decision as long as it did not interfere with Alley's right to a fair trial. *See State v. Tremblay,* 2003 ME 47, ¶ 24, 820 A.2d 571, 578. If the State committed a discovery violation, we must decide whether the violation interfered with Alley's right to a fair trial. *See State v. Mannion,* 637 A.2d 452, 454–55 (Me.1994) (citing *State v. Tibbetts,* 604 A.2d 20, 23 (Me.1992)).

[¶ 31] There is nothing in the Maine Rules of Criminal Procedure that prohibits one party from contacting another party's witness, expert or otherwise, about his or her expected testimony. Gardner was free to oblige or reject Leighton's request for information. Contrary to Alley's assertion, the State is not limited to obtaining information from an accused only by means that are affirmatively permitted by the rules of discovery, especially where, as here, there is no claim of bad faith or subterfuge, and the information was voluntarily disclosed. There was no interference with Alley's right to a fair trial resulting from the pretrial disclosure of information by Alley's expert witness and, therefore, the trial court acted within the bounds of its discretion in permitting the State to cross-examine Alley's bloodstain expert.

[¶ 32] We have considered Alley's remaining arguments and find that they have no merit.

The entry is:

Judgment affirmed.