1998 ME 60

**STATE of Maine**

v.

**Zaccheus KING.**

Supreme Judicial Court of Maine.

Argued Jan. 5, 1998

Decided March 25, 1998.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

ROBERTS, Justice.

[¶ 1] Zaccheus King appeals from the judgment entered in the Superior Court (Androscoggin County, *Delahanty, J.*) convicting him of manslaughter (Class A) in violation of 17-A M.R.S.A. § 203 (1983 & Supp.1997). King contends that the court erred by refusing to suppress all statements that he made to a police officer and that the court erred by failing to reinstruct the jury concerning the primary crimes of robbery and assault when it requested clarification of accomplice liability. He also challenges the sufficiency of the evidence to support his conviction as an accomplice in the commission of the crime of manslaughter. Finally, he argues that the court erred in its determination of his basic period of incarceration. We affirm the judgment and the sentence.

I.

[¶ 2] In the early morning hours of April 16, 1995, Juan Carlos Rodriquez, a crack cocaine dealer, was shot and killed in Lewiston. King, along with Joseph Jackson and Jeremiah Moore, was indicted for Rodriquez's murder pursuant to 17-A M.R.S.A. § 201(1)(A) (1983 & Supp.1997). King subsequently filed a motion to suppress all statements that he made during a police interrogation on the day of Rodriquez's death. The court denied King's motion, finding that King voluntarily waived his right to remain silent.

[¶ 3] At King's trial numerous witnesses testified that the night before his death, Rodriquez had an argument with Jackson and/or Moore about a cocaine-for-marijuana trade. King was not involved in the argument, nor was he present during the incident. Sometime after midnight, however, he returned with Jackson, Moore, and a fourth man to the apartment where Rodriquez was staying. King, Jackson, and the fourth man entered the apartment building. After Jackson entered the apartment, he fired three or four shots into Rodriquez. Another shot was fired from behind Jackson.[1]

Andrew Ketterer, Attorney General, Nancy Torresen, Asst. Atty. General (orally), William R. Stokes, Asst. Atty. Gen., Augusta, for State.

Leonard I. Sharon (orally), Sharon, Leary & DeTroy, Auburn, and Mary Beth Crocker (orally), York Beach, for defendant.

1. For a more detailed description of the events leading to Rodriquez's death, see our opinion in

*State v. Jackson,* 1997 ME 174, 697 A.2d 1328,

[¶ 4] In April 1996 a jury found King guilty as an accomplice to the crime of manslaughter. At his sentencing hearing, the court established his basic period of incarceration at 25 years. It then imposed the sentence of 25 years with all but 18 years suspended followed by a 6–year period of probation. King appeals both his conviction and his sentence.

## II

[¶ 5] Detective Geoffrey Cummings of the Maine State Police interviewed King about his involvement in Rodriquez's death. Before beginning the interrogation, Cummings recited the *Miranda* warnings to King and told him that he could terminate the interview at anytime. Walter Coleman, a friend of King's mother, was present at the interview and also informed King that he did not have to answer any questions. King voluntarily agreed to proceed with the interview.

[¶ 6] After Coleman left the room with another officer, King became reluctant to talk to Cummings. He stated that he wanted Coleman present to ensure that Cummings did not later misquote him. Cummings assured him that the interview was being recorded, but King again stated, "I'm just saying, you know, ... I ain't saying nothing." Cummings responded, "Zach ... you'd better start coming clean," and resumed questioning King about the shooting. King asserted that he did not know anything about Rodriquez's death and reiterated his earlier statement that he did not want to answer questions in Coleman's absence. King requested Coleman's presence on numerous occasions during the interview. Cummings did not, on any of these occasions, ask King whether he was invoking his right to remain silent. After Coleman came back into the interrogation room, King admitted to being present at the apartment.

[¶ 7] King contends that the court erred by failing to suppress the statements that he made during his interview with Cummings. He argues that he unequivocally invoked his right to retract his waiver and reassert his right to remain silent during the interview

and that Cummings violated his Fifth Amendment right to remain silent by failing to terminate the interview. Alternatively, King asserts that at a minimum his assertions were ambiguous, and pursuant to our decisions in *State v. Ladd,* 431 A.2d 60 (Me.), *cert. denied,* 454 U.S. 1101, 102 S.Ct. 677, 70 L.Ed.2d 643 (1981) and *State v. Ayers,* 433 A.2d 356 (Me.1981), *cert. denied,* 466 U.S. 941, 104 S.Ct. 1919, 80 L.Ed.2d 466 (1984), Cummings should have limited his inquiry to clarifying whether King was invoking his Fifth Amendment right to remain silent. The State counters that King's statements were not a clear invocation of his right to remain silent. It further asserts that the statements were at the most ambiguous and that pursuant to the United States Supreme Court's decision in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the officer was not obligated to terminate the interrogation. We agree.

[¶ 8] The trial court did not explicitly state whether it found King's statements ambiguous. Implicit in its findings, however, is its conclusion that even if one were to assume that the statements were ambiguous, the officer, pursuant to *Davis,* was not obligated to terminate the interrogation.

 [¶ 9] The Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), described an individual's "right to cut off questioning" as follows:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questions, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

affirming Jackson's conviction for manslaughter and Moore's conviction for murder.

*Id.* at 473–74, 86 S.Ct. at 1627–28. In *Ladd* and *Ayers,* we interpreted the *Miranda* decision to require that when an individual equivocally asserts the "right to cut off questioning," an officer may make a limited inquiry to clarify whether the individual is, indeed, invoking the right to remain silent. We, likewise, employed this rule when an individual ambiguously asserts the right to counsel. *See State v. McCluskie,* 611 A.2d 975, 977 (Me.), *cert. denied,* 506 U.S. 1009, 113 S.Ct. 625, 121 L.Ed.2d 558 (1992). The Supreme Court in *Davis* clarified that such a limitation is not required by *Miranda* and explained that

> if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.

*Davis v. United States,* 512 U.S. at 459, 114 S.Ct. at 2355. Contrary to King's assertions, whether *Miranda* is applicable in a given situation is a matter of federal constitutional law, *State v. McKechnie,* 1997 ME 40, ¶ 7 n. 1, 690 A.2d 976, 978 n. 1, and we are, therefore, bound by the principles enunciated by the Supreme Court. Moreover, King has not advanced, nor can we discern, any reason that the Court's decision in *Davis* be limited to an individual's right to retract a waiver and reassert the right to counsel. *See Coleman v. Singletary,* 30 F.3d 1420, 1424 (11th Cir.1994), *cert. denied,* 514 U.S. 1086, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995). We therefore follow the principles set forth in *Davis* that in order to assert one's right to "cut off questioning" an individual must articulate a desire "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement" to be a retraction of a waiver and a reassertion of the right to remain silent. *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355. None of King's statements meet this standard of clarity.

### III.

[¶ 10] King also argues that the court committed error in its reinstruction to the jury when they requested a clarification about accomplice liability and that the jury's findings that he aided and abetted Jackson in the manslaughter of Rodriquez are not supported by sufficient evidence. We are unpersuaded by either argument.

[¶ 11] Because King failed to object to the court's reinstruction, we review the instruction for obvious error. *State v. McCluskie,* 611 A.2d at 978. When a court instructs a jury about the primary crimes at issue in its original instruction and then fails to reinstruct a jury about the crimes in its reinstruction, it has not committed error, let alone obvious error. *See State v. Dow,* 616 A.2d 864, 865 (Me.1992). In addition, the jury, based on the evidence viewed in the light most favorable to the State, could have rationally found beyond a reasonable doubt that King was an accomplice in the killing of Rodriquez. *State v. Barry,* 495 A.2d 825, 826 (Me.1985).

### IV.

[¶ 12] King's final argument is that the court erred in determining his basic period of incarceration. In sentencing King, the court first found that King's offence was among the "most heinous and violent crimes committed against a person" and set a basic period of incarceration within the extended sentencing range for Class A crimes. In doing so, the court noted that King willingly went to a haven for drug activity and that the evidence indicated that King acted as a backup. The court then set his basic period of incarceration at 25 years. After weighing the mitigating and aggravating factors, it determined that the basic period of 25 years should be the maximum period of incarceration. Finally, the court imposed the sentence of 25 years with all but 18 years suspended to be followed by a 6–year period of probation.

[¶ 13] Because the sentencing of individuals convicted of Class A crimes has been a source of confusion and because the confusion stems from the distinction between our decisions in *State v. Lewis,* 590 A.2d 149 (Me.1991), and *State v. Hewey,* 622 A.2d 1151 (Me.1993), we explain the principles enunciated in those decisions and clarify the relationship between these principles. In *Lewis,* we

determined that the intent of an amendment to the criminal code that doubled the maximum sentence for Class A crimes was to create two discrete ranges of sentences for these crimes. *Lewis,* 590 A.2d at 151. Relying on the language in the Statement of Fact to the committee amendment, we concluded that the statutory maximum sentence was increased to 40 years only for " 'the most heinous and violent crimes that are committed against a person.' " *Id.* (quoting Comm. Amend. A to L.D. 2312, No. H–720, Statement of Fact (113th Legis.1988)). When determining what is the statutory maximum for a Class A crime, a court must, therefore, first determine whether the crime in question is one involving heinous and violent conduct against a person. Recently, in *State v. Jackson,* 1997 ME 174, 697 A.2d 1328, we stated that "[i]n deciding whether a sentence in the extended range is consistent with the principles set forth in *Lewis,* we look at the *entire* record." *Id.* at ¶ 11, 697 A.2d at 1331 (emphasis added). Moreover, our objective when examining the soundness of such a sentence is to implement the legislative intent.

[¶ 14] In contrast, the principles set forth in *Hewey* are not limited to Class A crimes, but apply to the imposition of any sentence of one year or more regardless of the class of the crime. In *Hewey,* we explained that sentencing is a three-step process. The court must first determine the basic period of incarceration " 'by considering the particular nature and seriousness of the offense without regard to the circumstances of the offender.' " *Hewey,* 622 A.2d at 1154 (quoting *State v. Weir,* 600 A.2d 1105, 1106 (Me.1991)). The court then must consider mitigating and aggravating factors to individualize each sentence. *Hewey,* 622 A.2d at 1154. Finally, the court may suspend a portion of the sentence to arrive at the offenders final sentence. *Id.* at 1155. We review a trial court's determination of the basic period of incarceration for misapplication of principle and give greater deference to both its assessment of aggravating and mitigating factors and its determination whether a portion of the sentence should be suspended. *Id.*

[¶ 15] Contrary to King's assertions, the court did not err in finding that King's offence was one of the "most heinous and violent crimes committed against a person." *Lewis,* 590 A.2d at 151. As we stated in *Jackson,* we review whether a sentence in the extended range is consistent with *Lewis* by examining the entire record. Moreover, we review the sentence irrespective of the sentencing court's findings. In *Jackson,* we affirmed the court's selection of a basic period of incarceration within the extended sentencing range for Jackson's involvement in Rodriquez's death. *Jackson* at ¶ 11, 697 A.2d at 1331–32. We noted that drugs and guns are a lethal combination. *Id.,* 697 A.2d at 1331. We also stated that "[a]lthough not dispositive, [a] court may consider that manslaughter, unlike some other Class A crimes, is a crime that results in the death of a human being." *Id.,* 697 A.2d at 1331–32. King, likewise, voluntarily went to a known haven for drug activity and knew or should have known that trouble would likely develop. In these circumstances, we cannot say that the court erred in finding that King's crime was among the "most heinous and violent crimes committed against a person."

[¶ 16] We also disagree with King's contentions that the court violated the principles set forth in *Hewey* when setting his basic period of incarceration. In applying the *Hewey* principles, the court can rely on any factually reliable evidence. *State v. Whitten,* 667 A.2d 849, 852 (Me.1995). We have stated that information obtained through the trial process is factually reliable because it is derived from the sworn testimony of witnesses subject to cross-examination and observation by the court. *State v. Dumont,* 507 A.2d 164, 166–67 (Me.1986). Although there were contradictory accounts about King's involvement in Rodriquez's death, the trial court did not err by finding that King acted as a "backup" and chose to carry and use guns and by relying on these findings to set King's basic period of incarceration. The court heard the testimony of the various witnesses and could, therefore, judge the credibility of the different accounts.

[¶ 17] Moreover, the court's comments regarding the evidence in King's presentence report were made in the context of a *Lewis,* and not a *Hewey,* analysis. Assuming *arguendo* that the court considered this information in applying the principles set forth in *Hewey,* its use of such evidence did not amount to a misapplication of principle. The court used the evidence to support its own findings that King acted as a "backup" and went with Jackson and Moore to the apartment where Rodriquez was staying knowing that trouble would likely develop. In these circumstances, any error in the court's remarks was harmless.

The entry is:

Judgment affirmed. Sentence affirmed.

