MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2017 ME 2
Docket:       And-15-593
Argued:       September 13, 2016
Decided:      January 5, 2017

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

WILLIAM TRUE

SAUFLEY, C.J.

[¶1]  Twenty-year-old Romeo Parent was killed in April 2013.  He had been stabbed in the back of the neck, beaten, and choked.  William True was charged with, and found guilty by a jury of, the intentional or knowing, or depraved indifference murder of Parent.[1]  True appeals from the judgment of conviction entered by the court (*MG Kennedy, J.*).  *See* 17-A M.R.S. § 201(1)(A), (B) (2015).  He argues that the judgment should be vacated because he was deprived of a fair trial due to allegedly perjured testimony from certain of the State's witnesses.  We affirm the judgment.

---

[1]  True was also convicted of hindering apprehension or prosecution (Class B), 17-A M.R.S. § 753(1-B)(C)(1) (2015), but he does not appeal from his conviction of this offense.

## I. BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt.  *See State v. Westgate*, 2016 ME 145, ¶ 5, --- A.3d ---.  During the weekend of April 6 and 7, 2013, True was in jail after Parent informed the police that the two of them had committed a robbery.  On Tuesday, April 9, 2013, at about 7:40 p.m., Nathan Morton[2] and Michael McNaughton,[3] who were known to both Parent and True, picked Parent up in a pharmacy parking lot in Auburn in Morton's vehicle.  McNaughton had planned to kill Parent for being a "snitch."  Morton, the driver, then drove to the home of True's friend Eric Leighton on James Street in Auburn and picked up True, who had been released from jail.[4]

---

[2] Nathan Morton was convicted of conspiracy to commit murder and hindering apprehension or prosecution based on a plea agreement that he reached with the State.  *State v. Morton*, No. AUBSC-CR-2013-524 (Me. Super. Ct., And. Cty., June 26, 2014).  A month after True's trial ended, the court (*MG Kennedy, J.*), pursuant to the agreement, sentenced Morton to twenty years, all but ten suspended, for conspiracy to commit murder, and a concurrent ten-year sentence for hindering apprehension or prosecution.  *Id.* (Jan. 23, 2015).

[3] Michael McNaughton was convicted of murder and hindering apprehension or prosecution, and the court (*MG Kennedy, J.*) sentenced him to life in prison for the conviction of murder and ten years in prison for the conviction of hindering apprehension or prosecution, to be served concurrently with the life sentence.  *State v. McNaughton*, No. AUBSC-CR-2013-458 Unified Criminal Docket (Androscoggin Cty., Sept. 15, 2016).  His appeal is now pending with us.  *State v. McNaughton*, No. And-16-447 (Me. Sept. 26, 2016).  The Sentence Review Panel denied his application for leave to appeal from his sentence.  *State v. McNaughton*, No. SRP-16-446 (Me. Sent. Rev. Panel Oct. 26, 2016).

[4] The conditions of True's release from jail are not detailed in the record.

[¶3]  Morton drove to a secluded location on South Mountain Road in Greene.  True and McNaughton exited the car with Parent, and the three went into the woods while Morton, who is disabled, waited in the car.  Once in the woods, McNaughton stabbed Parent in the back of the neck with a screwdriver and used a brake cable to choke him repeatedly while True punched and kicked Parent.  Although Parent bled only a little from the stabbing, a small amount of his blood got on the leg of True's jeans.  True injured his foot, and it bled.  Parent died due to the constriction of blood vessels in his neck.

[¶4]  Morton drove away with True and McNaughton at about 9:20 p.m.  He dropped True off near his friend Theodore Gagnon's house.  During the next morning, April 10, True returned to Leighton's residence in Auburn looking for a duffel bag.  He obtained large garbage bags from Leighton.  True left Leighton's apartment and got in the car with Morton and McNaughton, after which Morton drove to pick up bedsheets from another friend.  The three went to Morton's residence, where they waited until dark and then went to Greene to move Parent's body.

[¶5]  When they arrived in Greene, True and McNaughton cut the shirt and pants off Parent's body, bound Parent's hands and feet with strips of sheet

fabric, wrapped Parent's body in garbage bags, and placed his body on a sheet in Morton's trunk. Morton drove to Jug Stream in Monmouth, where True and McNaughton threw Parent's body into the water from above a dam. They later threw the sheet out the window of the car.

[¶6] Morton dropped True off near Leighton's home. Leighton called the police when True attempted to get into his house. True was arrested by police at 12:24 a.m. because he was violating a curfew imposed as a condition of bail. Police investigators found Parent's body in Jug Stream on Friday, April 12, 2013.

[¶7] In July 2014, True was charged by indictment with intentional or knowing, or depraved indifference murder, 17-A M.R.S. § 201(1)(A), (B); conspiracy to commit intentional murder (Class A), 17-A M.R.S. § 151(1)(A) (2015); and hindering apprehension or prosecution (Class B), 17-A M.R.S. § 753(1-B)(C)(1) (2015).

[¶8] An eleven-day jury trial was held from December 3 through 17, 2014. The State presented testimony from multiple members of state and local law enforcement; an employee of a youth outreach center frequented by Parent and True; the medical examiner who conducted the autopsy of Parent's body; the Maine State Crime Lab personnel who examined the physical

evidence; Morton; Leighton; Gagnon; and many friends of True, McNaughton, and Parent who socialized and used drugs with the three of them around the time of the murder. Many of the friend witnesses, including Morton, Leighton, and Gagnon, whose testimony True now challenges as perjured, were subjected to intense cross-examination by defense counsel, highlighting their drug use at the time and the inconsistencies in their statements to police and others.

[¶9] Morton conceded, during extensive cross-examination, that he told police conflicting stories on various occasions and did not mention True being involved in the murder at all until reaching an agreement with the State to resolve his own pending charges of murder, conspiracy to commit murder, and hindering apprehension or prosecution. As a result of that agreement, Morton received a sentence of twenty years in prison, all but ten years suspended, for conspiracy to commit murder, and a concurrent ten-year sentence for hindering apprehension or prosecution. Leighton also acknowledged inconsistent statements and lies that he told the police, and Gagnon admitted that he had not—even when previously testifying under oath—told anybody about True's statement that Parent had been "taken care of."

6

[¶10]  True did not testify.  Nor did he present additional witnesses or other evidence.

[¶11]  The jury found True guilty of murder and hindering apprehension or prosecution, and not guilty of conspiracy to commit intentional murder.  True moved to dismiss or for a new trial on multiple grounds.  As one ground for the motion, he asserted that the State had presented testimony from Morton, Leighton, and Gagnon that it knew or should have known was perjured.  The State moved to dismiss True's motion for a new trial as untimely, and the parties supplied memoranda concerning the motions.  In his memorandum, True argued that Morton had told fellow inmates, before True's trial, that he was lying about True to get a good deal from the State and that he had bragged after the trial that he had been responsible for True's conviction and sentence.  True offered an affidavit from an inmate in support of his motion.  Subpoenas and writs of habeas corpus were issued, and Morton was appointed counsel, in anticipation of multiple witnesses testifying regarding True's motion.

[¶12]  On November 3, 2015, True withdrew his motion to dismiss and for a new trial in exchange for (1) the State's agreement to seek the twenty-five year minimum mandatory sentence for a murder conviction, *see*

17-A M.R.S. § 1251 (2015), with a concurrent ten-year sentence on the charge for hindering apprehension or prosecution, and (2) the State's dismissal of all other known criminal charges—specifically, a burglary and theft indictment and a bail violation charge. At the plea and sentencing hearing, True represented that he did not intend to appeal from his conviction but did not waive his right to do so. The State indicated at the sentencing that, despite True's right to appeal, any issues arising from the withdrawn motion would not be "preserved" for appeal. The State did not say, and the court did not inform True, that his withdrawal of the motion would operate as a full waiver of his right to press the issue of possible perjury. The court informed True that he retained the rights to appeal from the judgment of conviction, to petition for review of the sentence, and to petition for post-conviction review. The court accepted the sentencing agreement and sentenced True to twenty-five years in prison for murder and ten years in prison for hindering apprehension or prosecution, to be served concurrently with the murder sentence. The court also ordered True to pay fifty dollars to the Victims' Compensation Fund.

[¶13] True brought the present appeal. *See* 15 M.R.S. § 2115 (2015); M.R. App. P. 2.

## II. DISCUSSION

[¶14]  We first address the State's argument that True waived the issues he now raises on appeal because he withdrew his motion to dismiss or for a new trial, which raised the same issues of witness perjury, in exchange for the dismissal of other charges and a sentence at the mandatory minimum of twenty-five years.  Waiver occurs when a defendant voluntarily, knowingly, and intentionally relinquishes or abandons a known right.  *See State v. Tuplin*, 2006 ME 83, ¶ 14, 901 A.2d 792.  It appears on the record presented that True voluntarily, knowingly, and intentionally opted not to follow through with his motion to dismiss or for a new trial as part of a negotiated plea agreement. We would ordinarily determine, therefore, that he waived the opportunity to challenge the issues that he had raised in his post-trial motion by intentionally withdrawing that motion and thereby precluding any evidentiary hearing that would determine which of the witnesses' varying stories—delivered under oath—might be untruthful.  *See State v. Foster*, 2016 ME 154, ¶ 10, --- A.3d ---; *cf. United States v. Gates*, 698 F. Supp. 2d 212, 218-19 (D. Me. 2010) (denying a motion to withdraw a guilty plea when the defendant strategically decided to plead guilty during trial as part of an agreement with the government, rather than test a witness's testimony through trial).

[¶15]   However, when fundamental constitutional rights are at stake, "every reasonable presumption is made against a finding of waiver."  *Tuplin*, 2006 ME 83, ¶ 16, 901 A.2d 792.  Despite True's withdrawal of the motion to dismiss or for a new trial and the apparent waiver of the claims he raised in that motion, we will address the issue he raises as an unpreserved claim of error because True may have based his decision-making on the State's position, expressed during the plea and sentencing hearing, that all issues raised in his motions would be treated as not "preserved," with no reference made to any waiver of the claims.  We *do* review unpreserved claims of error in criminal cases, although only for obvious error, meaning that there is "'(1) an error, (2) that is plain, and (3) that affects substantial rights.'"  *State v. McBreairty*, 2016 ME 61, ¶ 20, 137 A.3d 1012 (quoting *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147); *see* M.R. Crim. P. 52(b) (Tower 2014).[5]  "'If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings.'"  *State v. Daluz*,

---

[5]   The Maine Rules of Unified Criminal Procedure were not yet in effect at the time of trial, though they contain the same provision regarding obvious error.  *See* M.R.U. Crim. P. 52(b).

2016 ME 102, ¶ 51, 143 A.3d 800 (quoting *Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147).[6]

[¶16] True argues that allegedly false testimony from Morton, Leighton, and Gagnon deprived him of a fair trial. He contends that Morton told many lies throughout the investigation and proceedings such that his testimony cannot be relied on, that Leighton perjured himself at trial about being assaulted by a friend of McNaughton's at a time when that friend was not in Maine, and that Gagnon committed perjury when testifying to True's statement that Parent had been "taken care of"—a statement that he had not previously conveyed to anyone, even when testifying under oath during a previous court proceeding.

[¶17] Pursuant to the Fourteenth Amendment to the United States Constitution, a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[A] conviction obtained through use of false evidence, known to be such by representatives

---

[6] We acknowledge that, in other contexts, primarily in civil appeals, we have treated issues that are "unpreserved" as non-reviewable on appeal. *See, e.g.*, *Bickford v. Onslow Mem'l Hosp. Found., Inc.*, 2004 ME 111, ¶ 8, 855 A.2d 1150; *Landmark Realty v. Leasure*, 2004 ME 85, ¶ 10, 853 A.2d 749. In the context of criminal appeals, in order to assure that special care is taken with constitutionally established liberty interests, we do undertake appellate review of unpreserved claims of error when they are properly raised on appeal. *See* M.R. Crim. P. 52(b) (Tower 2014); M.R.U. Crim. P. 52(b); *see, e.g.*, *State v. Westgate*, 2016 ME 145, ¶ 15, --- A.3d ---; *State v. Pratt*, 2015 ME 167, ¶ 28, 130 A.3d 381. Our interchangeable use of the terms may have led to the State's use of the phrase "not properly preserved" at the sentencing agreement hearing when "waiver" may have been the concept it intended to express.

of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also State v. Brunette*, 501 A.2d 419, 423 (Me. 1985).

[¶18] Although True argued in support of his motion to dismiss or for a new trial that the State knew or should have known that it was presenting false testimony, True has not argued on appeal that the State knew that the evidence it offered was false—and, in fact, at oral argument, True expressly stated that he was not asserting that the State had engaged in unethical conduct at trial. Nor does the record contain evidence of any such knowledge. When the State is not alleged to have *knowingly* presented perjured testimony, "a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (alteration in original) (quotation marks omitted).

[¶19] As a threshold matter, a defendant must satisfy the basic and fundamental burden of demonstrating that the information delivered at trial was perjured—not merely inconsistent with other evidence or previous testimony. *See United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987). A

showing that trial testimony is inconsistent with other testimony or evidence does not, standing alone, demonstrate that evidence presented to the fact-finder contained intentional inaccuracies or that there had been a knowing use of false testimony. *See United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990); *State v. Pratt*, 565 A.2d 90, 91-92 (Me. 1989)*.* Such inconsistencies present issues of credibility and call for the weighing of conflicting or inconsistent evidence—a task that falls solidly within the province of the jury as the fact-finder. *See State v. Weaver*, 2016 ME 12, ¶ 14, 130 A.3d 972. "The jury is permitted to draw all reasonable inferences from the evidence and is free to selectively accept or reject testimony presented based on the credibility of the witness or the internal cogency of the content." *State v. Perkins*, 2014 ME 159, ¶ 13, 107 A.3d 636 (quotation marks omitted). The jury may "believe some parts of witness testimony to the exclusion of others," and may "combine . . . testimony in any way." *State v. Crossman*, 2002 ME 28, ¶ 10, 790 A.2d 603 (quotation marks omitted).

[¶20]  On the record before us, True is correct that the trial record contains evidence that the three witnesses upon whom he has focused told inconsistent stories at different times and in different court proceedings. True has not, however, demonstrated that any particular testimony about the

events was perjured, much less that any perjured testimony contributed to the jury's verdict. *See Wallach*, 935 F.2d at 456. The jury could take into account that the trial was held more than a year after the murder and that many witnesses were admittedly under the influence of drugs—or suffering withdrawal symptoms—when the events took place.

[¶21] Furthermore, the State presented other evidence at trial that corroborated those three witnesses' testimony sufficiently for a jury rationally to find that True had either "[i]ntentionally or knowingly cause[d] the death of" Parent or "[e]ngage[d] in conduct that manifest[ed] a depraved indifference to the value of human life and that in fact cause[d] the death of" Parent. 17-A M.R.S. § 201(1)(A), (B). In addition to the testimony of Morton, Leighton, and Gagnon, the State offered evidence that (1) after learning that Parent had left the pharmacy with Morton and McNaughton, True told a friend that he was supposed to have gone with them, grabbed a couple of things, and left quickly; (2) at the time of the murder, True was not at Gagnon's residence as Morton had told True's girlfriend he would be; (3) Morton told another friend, about a week after the murder, that True had more involvement in Parent's murder than she knew; (4) McNaughton said that True had been with him during the murder and had kicked Parent just after he died; (5) an

investigating detective testified that True's foot was injured and had bled; (6) Parent had contusions on his head that were likely inflicted with fists or boots while Parent was on the ground; (7) the wound at the back of Parent's head bled, though not a lot because the screwdriver did not hit a major artery; and (8) a small amount of Parent's blood, as well as True's own, was found on True's jeans.

[¶22]  On the available record, True has presented no basis to vacate the judgment of conviction because it is impossible to conclude as a matter of law that perjured testimony was admitted and contributed to the jury's verdict. *See Wallach*, 935 F.2d at 456.  Nor has True demonstrated that the evidence presented by any of the challenged witnesses was so incredible as not to meet a minimum standard of relevance.  *See* M.R. Evid. 401 (Tower 2014).[7] Although there were inconsistencies in the evidence, each witness was subjected to vigorous cross-examination during a trial held more than a year after the events at issue, and the jury had a full opportunity to weigh the effect of the passage of time and other factors, including drug use, on the weight and credibility of the witnesses' testimony and other evidence.  True has failed to demonstrate that he was deprived of a fair trial.  There is no error, much less

---

[7]  The Maine Rules of Evidence were restyled, effective after True's trial, but no substantive changes to Rule 401 were made.

obvious error, on this record.  *See McBreairty*, 2016 ME 61, ¶ 20, 137 A.3d 1012.

The entry is:

Judgment affirmed.

---

James P. Howaniec, Esq. (orally), Lewiston, for appellant William True

Janet T. Mills, Attorney General, Donald W. Macomber, Asst. Atty. Gen., and John Alsop, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Androscoggin County Superior Court docket number CR-2014-699
FOR CLERK REFERENCE ONLY