MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2017 ME 173
Docket:      And-16-447
Argued:      May 12, 2017
Decided:     August 1, 2017

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

MICHAEL R. MCNAUGHTON

HUMPHREY, J.

[¶1]  Michael R. McNaughton appeals from a judgment of conviction entered in the trial court (Androscoggin County, *MG Kennedy, J.*) after a jury found him guilty of intentional or knowing or depraved indifference murder, 17-A M.R.S. § 201 (2016), and hindering apprehension or prosecution (Class B), 17-A M.R.S. § 753(1-B)(C)(1) (2016).  McNaughton argues that the court erred when it denied his motion to suppress evidence of statements that he made during a police interview and photographs, taken by law enforcement officers, of injuries to his body.  He also argues that the court should have granted his motion for a new trial based on his contention that the State presented perjured testimony during his trial.  We affirm the judgment.

## I. BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt.  *See State v. Gagne*, 2017 ME 63, ¶ 3, 159 A.3d 316.  On Friday, April 5, 2013, Romeo Parent, the victim in this case, informed police that he and William True had committed a theft.  As a result, True was detained in jail for a period of time.  McNaughton, who knew both Parent and True, put out the word among acquaintances that he planned to harm Parent for "snitching" on True and that he was looking for Parent.

[¶3]  On Tuesday, April 9, 2013, McNaughton and another acquaintance, Nathan Morton, learned that Parent was at a pharmacy in Auburn.  By this point, McNaughton had told Morton that they needed to kill Parent.  Morton drove McNaughton to the pharmacy, where they asked Parent to get in the car with them.  Parent agreed to go with them and they picked up True after leaving the pharmacy.

[¶4]  Morton drove the group—himself, McNaughton, True, and Parent—to a remote location on South Mountain Road in Greene.  McNaughton, True, and Parent got out of the car and went down a trail into the woods.  There, McNaughton stabbed Parent in the neck with a

screwdriver. True punched and kicked Parent. McNaughton strangled him repeatedly with a garrote, a wire with a wooden dowel at each end, until he died.

[¶5] The next day, April 10, McNaughton, True, and Morton returned to the murder scene. McNaughton and True wrapped Parent's body in trash bags and put it in the trunk of Morton's car. Morton drove the group to Jug Stream in Monmouth, and McNaughton and True threw the body into the water.[1]

[¶6] Law enforcement officers interviewed McNaughton in the evening on April 11, 2013. During that interview, they photographed injuries on McNaughton's body and collected his clothing. Officers interviewed McNaughton again in the early morning hours on April 12, 2013; during that interview, McNaughton admitted to killing Parent.

[¶7] On May 8, 2013, the State charged McNaughton by indictment with intentional or knowing or depraved indifference murder, 17-A M.R.S.

---

[1] True was convicted of murder and hindering apprehension or prosecution. *See generally State v. True*, 2017 ME 2, 153 A.3d 106. We affirmed his murder conviction on appeal. *Id.* Morton entered into a plea agreement pursuant to which he would plead guilty to conspiracy to commit intentional murder and hindering apprehension or prosecution, receive a sentence of twenty years in prison with all but ten years suspended, and testify truthfully in the cases against McNaughton and True. *See id.* ¶ 9.

4

§ 201(1)(A), (B); and hindering apprehension or prosecution (Class B), 17-A M.R.S. § 753(1-B)(C)(1).[2]

[¶8] McNaughton moved to suppress evidence of incriminating statements that he had made during the police interviews as well as the photographic evidence of his injuries. He argued that his statements were made involuntarily and in response to continued questioning after he had invoked his right to remain silent, and that the photographs of his injuries were collected impermissibly absent a search warrant or an exception to the Fourth Amendment's warrant requirement.

[¶9] At a two-day hearing on McNaughton's motion to suppress in May 2014, the court heard testimony from four law enforcement officers who were involved in McNaughton's police interviews. The court admitted in evidence transcripts and recordings of both interviews as well as the photographs of McNaughton's injuries.

[¶10] The court denied McNaughton's motion in part, declining to suppress the photographs collected and evidence of incriminating statements McNaughton made up to a certain point during the second interview. The court granted the motion as to statements McNaughton made in response to

---

[2] By the same indictment, McNaughton was also charged with conspiracy to commit murder (Class A), 17-A M.R.S. § 151(1)(A) (2016). The State dismissed that charge before trial.

continued questioning after he stated "I really don't want to speak any more on the subject" and "I'll take Mariah," which the court interpreted to mean "*Miranda*." In its detailed and thorough order, the court found the following facts, which are supported by evidence admitted at the suppression hearing. *See State v. Kittredge*, 2014 ME 90, ¶ 7, 97 A.3d 106.

[¶11] On April 11, 2013, two police officers made contact with McNaughton in Lewiston. McNaughton voluntarily agreed to accompany them to the Lewiston Police Department and rode in the back seat of their unmarked truck to the police station. He was not handcuffed or otherwise restrained and he was not placed under arrest. When they arrived at the police station around 7:20 p.m., an officer escorted McNaughton to an interview room and told him that someone would be with him soon.

[¶12] Officers first interviewed, among other individuals, Sebastian Moody, an acquaintance of McNaughton's who, at trial, directly implicated him in Parent's murder. By the time they began their interview with McNaughton nearly two hours after he had arrived at the police station, Maine State Police Detectives Randall Keaten and John Hainey had received information that McNaughton was responsible for Parent's murder. Upon entering the interview room, Hainey observed that McNaughton had several scratches that

6

went from his chin to his throat, and that he had a black eye and injuries to his hands.

[¶13]   The detectives told McNaughton that the interview would be recorded, that he was not under arrest, that he could leave whenever he wanted to, and that he did not have to talk to them.  McNaughton responded, "So you're giving me the option to plead the fifth if necessary?"  He was told again that he could leave if he wanted, to which he said, "Fair enough.  I will sit right here and talk to you."  McNaughton was read *Miranda* warnings.  After each right was read, Hainey asked if he understood; McNaughton responded, "Yes, Sir."  Hainey asked, "[H]aving all those rights which I just explained to you in mind, do you wish to answer questions at this time?"  McNaughton replied, "Yes, Sir."

[¶14]  The detectives asked McNaughton questions about his activities during the previous several days and his relationships with Parent, True, Morton, and other acquaintances.  As the questions became more specific, McNaughton made several statements about how he felt "lost."  The detectives implied that they did not believe him when he denied knowing anything about Parent's death.  He continued to respond to the detectives' questions.  At one point, he stated that he wanted to "leave."  "In context," the court found, "it is

clear that the reference was to leaving Lewiston and not leaving the police interview."[3]   McNaughton never stated that he did not want to answer questions.

[¶15]   Hainey told McNaughton that the detectives needed to take photographs of his injuries.  They asked McNaughton if that was okay and he replied, "Fair enough."   Hainey asked if he had other clothing, and McNaughton said he only had one set of clothes and that his other clothing was in storage and he did not have the key.  Hainey told McNaughton that due to "exigent circumstances," they were going to take his clothes and give him replacement clothing and boots.   Hainey and Keaten left to make arrangements for photographs and replacement clothing, leaving McNaughton alone in the interview room.   During that time, without being asked, McNaughton removed his sweatshirt, shirt, and belt.

[¶16]   Detective Herb Leighton took numerous photographs of McNaughton's face, neck, and hand injuries.  The detectives asked questions about how the injuries occurred.  McNaughton was again told that he did not

---

[3] McNaughton stated, "This is why I would like to leave" immediately after Keaten referred to McNaughton's circle of friends in Lewiston as "downtown drama."   The court found that McNaughton had repeatedly expressed his desire to leave his wife and circumstances in Lewiston, explaining that he planned to travel to Massachusetts the next morning to start working at a carnival.

have to say anything and that he could stop talking any time he wanted to. Leighton collected McNaughton's clothes.

[¶17] After McNaughton had replacement clothing, Hainey again told McNaughton he could leave, continued questioning him, and "talked about mitigating factors."[4] McNaughton did not say that he wanted to leave the interview. Before the interview concluded, in response to one of the officers' questions, McNaughton said, "I tried to say no . . . when you asked me the same question again, it makes me want to give you a different answer." McNaughton continued to deny any involvement in the murder and left the police station at about 11:30 p.m.

[¶18] After McNaughton left, police questioned Morton, who gave them additional information about McNaughton's involvement in the murder. Morton identified the location of the murder and went with detectives to

---

[4] Specifically, the following exchange occurred:

Hainey: [W]e'd be more than willing to listen to you at any time and there's always consequences for your actions. There's always somewhat of a responsibility where you take responsibility for something, you know, you said you're not a bad guy.

Keaten: Mitigating factors.

McNaughton: What do you mean by that?

Keaten: Things that are in your favor. Things that you do to lessen the consequences are mitigating factors.

Greene, where they found signs of a struggle, clothing that they believed belonged to Parent, and a screwdriver.

[¶19]   At 2:45 a.m. on April 12, 2013, officers made contact with McNaughton again at an apartment in Lewiston where McNaughton had told them he would be staying that night.  McNaughton agreed to come back to the police station for further questioning.  He was again escorted to an interview room.  Hainey and Detective Wayne Clifford entered the room at 3:08 a.m.  Hainey said, "I wanted to get some more information.  We already read you *Miranda*, that's still in effect.  Your rights I read you earlier."  McNaughton responded, "Fair enough."

[¶20]  Hainey told McNaughton that he had gone to Greene with Morton and asked McNaughton to tell them what really happened.  McNaughton said that he could not tell them.  He also stated his name and then a nine-digit number.  Hainey said, "What's that?  You're not a prisoner of war, Michael, so I don't know why you are giving us your serial number."   The detectives continued to ask questions.[5]  The following exchange took place:

---

[5]  McNaughton contends that in response to Clifford's question of whether he would "rather talk to [the detectives] a little bit about what really happened," he said "No."  The evidence—two different transcriptions, a recording with audio and video, and testimony at the suppression hearing—was conflicting on this point.  In its ruling on a motion for further findings, the court specifically declined to find that McNaughton had said "No" to Clifford's question.

McNaughton: "You are asking some questions and I don't want to give the answers to you, Sir."

Clifford: "Why?"

Hainey: "Are you afraid?"

McNaughton: "Because he's told me that earlier when I read, I don't have to answer every question."

Clifford: "No."

McNaughton: "Well, I feel like you're backing me and making me feel smaller every time you ask me a question I don't want to answer."

Clifford: "Well, you didn't really say you didn't want to answer. You said you couldn't answer it."

McNaughton: "Fair enough."

[¶21] McNaughton "expressed discomfort speaking while being recorded and indicated he wished to speak with the detectives outside the confines of the interview room." Hainey and Clifford accompanied McNaughton outside the police station, where the interview continued. McNaughton made incriminating statements, indicating that Parent "fell back onto the screwdriver McNaughton was holding in his hand," that he was "holding a cable (garrote) around [Parent's] neck," and that he had moved Parent's body.

[¶22]  They returned to the interview room.  McNaughton was placed under arrest and given *Miranda* warnings again.  He acknowledged that he understood each right.  Asked if he wanted to answer questions, McNaughton jokingly said "not really"; asked to clarify, he said "yes."  He continued to answer questions about the murder, giving additional information about the garrote and how Parent died.  Eventually, in response to further questioning, McNaughton said, "I really don't want to speak any more on the subject," and "I'll take Mariah."  The detectives continued to question McNaughton and he continued answering questions.

[¶23]  The court determined, contrary to the State's argument, that both interviews were custodial but that McNaughton knowingly and voluntarily waived his *Miranda* rights in both instances.[6]  The court further found that McNaughton did not subsequently reassert his right to remain silent with sufficient clarity to require cessation of questioning until he stated, late in the second interview and after making incriminating statements, "I really don't want to speak any more on the subject," and "I'll take Mariah."  Next, the court found, beyond a reasonable doubt, that McNaughton made all statements

---

[6]  The court specified that the first interview "started out as non-custodial but became custodial."

prior to that point voluntarily. Finally, the court declined to suppress the photographs of McNaughton's injuries.

[¶24] The court held a thirteen-day jury trial from July 9 through July 28, 2014. During the trial, the court denied McNaughton's renewed motion to suppress the photographs of his injuries. The State's witnesses included multiple law enforcement officers, a medical examiner, and numerous acquaintances of McNaughton and Parent. Some elements of the acquaintances' testimony were inconsistent with statements that they had made in the past and with other evidence presented at trial. These inconsistencies were the subject of intensive cross-examination by defense counsel.

[¶25] On July 28, 2014, the jury found McNaughton guilty of murder and hindering apprehension or prosecution. McNaughton moved for a new trial in August 2014 and again, in an amended motion, in October 2014. In a second amended motion for a new trial filed in March 2015, McNaughton argued that his trial was unfair because the State had introduced allegedly perjured testimony. After a hearing, the court denied the motions.

[¶26] On September 15, 2016, the court entered a judgment on the jury's verdict. The court sentenced McNaughton to life in prison on the

murder count and a concurrent term of ten years in prison on the hindering apprehension count.

[¶27]  McNaughton timely appeals.

## II.  DISCUSSION

### A.  Motion to Suppress Evidence of Statements

[¶28]  McNaughton argues that the court erred when it denied his motion to suppress evidence of his incriminating statements.  Specifically, he argues that (1) after waiving *Miranda* rights but before making incriminating statements, he reasserted his right to remain silent in a manner sufficient to require cessation of police questioning; and (2) the State did not meet its burden to prove that his confession was made voluntarily.  We review the factual findings supporting the denial of a motion to suppress evidence for clear error and the court's ultimate conclusions de novo.  *See State v. Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595.  "We will uphold the denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision."  *State v. Cooper*, 2017 ME 4, ¶ 9, 153 A.3d 759 (quotation marks omitted).

14

### 1. Right to Remain Silent

[¶29]   The Fifth Amendment privilege against self-incrimination provides a suspect with a right to "cut off questioning" after he has received *Miranda* warnings and waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966); *State v. Marden*, 673 A.2d 1304, 1309 (Me. 1996); *see* U.S. Const. amend. V.   In *Berghuis v. Thompkins*, the United States Supreme Court held that the standards that apply to an invocation of the right to counsel also apply to an invocation of the right to remain silent. 560 U.S. 370, 381-82 (2010).   The Court noted its previous holding that "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation . . . or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Id.* at 381 (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).   The Court went on to explain that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent." *Id.*   As with an invocation of the right to counsel, therefore, a suspect must convey his desire to remain silent "unambiguously." *Id.* (quotation marks omitted).   We applied the same reasoning in *State v. King*, 1998 ME 60, ¶¶ 7-9, 708 A.2d 1014, in

which we held that "in order to assert one's right to 'cut off questioning' an individual must articulate a desire 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement' to be a retraction of a waiver and a reassertion of the right to remain silent," *id.* ¶ 9 (quoting *Davis*, 512 U.S. at 459).

[¶30]  In *State v. Marden*, a suspect repeatedly responded "no comment" to a detective's questions but also indicated a willingness to continue engaging in the interview.  673 A.2d at 1309-10.  The trial court denied the suspect's motion to suppress.  *Id.* at 1308.  On appeal, the defendant argued that the detective should have ceased questioning him when he asserted his right to cut off questioning by stating "no comment" repeatedly.  *Id.* at 1309.  We concluded that the trial court had not erred by "finding that [the suspect] did not clearly and unequivocally indicate that he did not want to answer any more questions."  *Id.* at 1310.  We also held that the detective's attempts to clarify the suspect's ambiguous "no comment" responses were permissible. *Id.*  We therefore distinguished the case from *State v. Ayers*, 433 A.2d 356, 359-62 (Me. 1981), in which we held that a detective had informed the suspect that she could *not* reassert her right to remain silent.  *Marden*, 673 A.2d at 1310.  We have never held that in the face of ambiguous

statements by a suspect, officers are *required* to ask clarifying questions about whether the suspect wants questioning to cease. *See King*, 1998 ME 60, ¶¶ 6-9, 708 A.2d 1014; *see also Davis*, 512 U.S. at 461-62.

[¶31]    Here, examining the "specific circumstances" in which McNaughton was questioned and his "response to that questioning," *State v. Lovejoy*, 2014 ME 48, ¶ 26, 89 A.3d 1066, the trial court found that McNaughton made several *ambiguous* statements about whether he wanted to answer some of the officers' questions. At times, he stated that he could not provide the answers that he felt the detectives were looking for even though he "want[ed] to" and he simply stated his name and a nine-digit number. At one point, he also stated that he didn't "want to give the answers" to "some questions," explaining that the officers had told him he didn't "have to answer every question." As the trial court determined, in context, none of these statements was sufficiently clear to convey—in an objectively unambiguous manner—a desire for police questioning to cease.[7] *See Berghuis*, 560 U.S. at 382. Contrary to McNaughton's contention, this is not a case like *Ayers*, in which a detective, in response to ambiguous statements by the suspect, indicated that the suspect would not be allowed to reassert her right to

---

[7]  As the court found, viewing the entirety of the officers' interactions with McNaughton as a whole, McNaughton's words and actions exhibited an affirmative willingness to continue talking. *See State v. Marden*, 673 A.2d 1304, 1310 (Me. 1996).

remain silent.  433 A.2d at 361.  Instead, as in *Marden*, the court here did not commit clear error when it implicitly found that the detective's requests for answers were not impermissible threats that any attempts to cut off questioning would be fruitless.  673 A.2d at 1310.

[¶32]  We discern no legal or factual error in the trial court's determination that during the entire first interview and the majority of the second interview, McNaughton did not articulate an objectively unambiguous desire for questioning to cease.[8]

2.    Voluntariness

[¶33]  Next, McNaughton challenges the trial court's determination that the State met its burden to prove that the statements the court declined to suppress were made voluntarily.  "We review the court's factual findings for clear error and its ultimate determination regarding voluntariness de novo." *State v. Hunt*, 2016 ME 172, ¶ 16, 151 A.3d 911 (alterations omitted) (quotation marks omitted).

[¶34]   "A confession cannot be admitted in evidence unless the confession was given voluntarily, and the State has the burden to prove

---

[8] McNaughton contends that courts in other jurisdictions have concluded that providing a name and social security number in response to questioning constitutes an unambiguous retraction of a *Miranda* waiver.  None of the cases he cites stands for that proposition, however, and we decline to adopt such a per se rule.  The particular circumstances of each case will continue to guide our analysis.  *See, e.g.*, *State v. Lovejoy*, 2014 ME 48, ¶ 26, 89 A.3d 1066.

18

voluntariness beyond a reasonable doubt." *Kittredge*, 2014 ME 90, ¶ 24, 97 A.3d 106. "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." *Id.* ¶ 25 (quotation marks omitted). In making a voluntariness determination, courts are to consider the totality of the circumstances, including

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. George*, 2012 ME 64, ¶ 21, 52 A.3d 903 (quotation marks omitted).

[¶35] McNaughton argues that the detectives' statements to him during the first and second interviews rendered his confession involuntary.[9] We have previously addressed several of the types of statements McNaughton focuses on and have concluded that they do not weigh heavily in the voluntariness calculus. *See Hunt*, 2016 ME 172, ¶ 23, 151 A.3d 911 ("[N]either generalized and vague suggestions that telling the truth will be helpful to a defendant in the long run nor mere admonitions or exhortations to tell the

---

[9] He argues that "the officers utilized the most common interrogative tactics often utilized by police in interrogations," including, for example, "the technique of informing McNaughton that they did not believe his denials."

truth will factor significantly into the totality of the circumstances analysis." (alteration omitted) (citations omitted) (quotation marks omitted)). These include the detectives' statements that McNaughton "needed" to tell the truth and their generalized implications that things would be better for him if he confessed.

[¶36]  McNaughton also argues that the detectives impermissibly suggested that he would receive leniency if he confessed to the murder. He highlights the detectives' discussion of "mitigating factors," the statement that they could "minimize it" if they "hear[d] from [him]," and the implication that he might have a better chance of seeing his children if he confessed. Statements like these are potentially more problematic because "false promises of leniency that induce a confession are improper and thus will weigh significantly into our consideration of the totality of the circumstances in determining whether a confession must be suppressed." *Id.* ¶ 29 (emphasis omitted).  Contrary to McNaughton's arguments, however, this case is not like those in which we have determined that false promises of leniency jeopardized the voluntary nature of a defendant's statements. *Cf. id.* ¶¶ 4-10, 41-44 (officers repeatedly implied to the defendant, a man with a cognitive impairment, that if he confessed to a sex crime he would not have to register

as a sex offender); *State v. Wiley*, 2013 ME 30, ¶ 21, 61 A.3d 750 (officer suggested that if the defendant confessed, he would face a short sentence involving county jail and probation instead of "a lot of time in state prison" (quotation marks omitted)); *State v. Tardiff*, 374 A.2d 598, 600-01 (Me. 1977) (officer suggested that if the defendant confessed to three burglaries he would only be charged with one).

[¶37]  Here, the detectives made no specific suggestions or promises about how the process of prosecution or sentencing would be better for McNaughton if he confessed to the murder.  Instead of offering a "concrete promise of leniency," *State v. Nadeau*, 2010 ME 71, ¶ 57, 1 A.3d 445, they explained "mitigating factors" only in the abstract.  We conclude that the court made no error in weighing the totality of the circumstances and determining that McNaughton made the incriminating statements at issue voluntarily.  We therefore do not disturb the court's decision to deny McNaughton's motion to suppress evidence of those statements.

B.    Motion to Suppress Photographs of Injuries

[¶38]  McNaughton also challenges the trial court's determination that the photographs collected during the first interview were obtained lawfully

pursuant to the exigent circumstances exception to the Fourth Amendment's warrant requirement and the "plain view" doctrine. We are not persuaded.

1.      Photographs of Publicly-Viewable Injuries

[¶39]  The Fourth Amendment protects citizens against unreasonable searches and seizures.   U.S. Const. amend. IV; *e.g.*, *State v. Carton*, 2016 ME 119, ¶ 15, 145 A.3d 555.  But "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  *Katz v. United States*, 389 U.S. 347, 351 (1967).  It is therefore well established that

> [a]n individual who exposes an object to public view has no reasonable expectation of privacy in that object.  Where such expectancy is lacking, the observation of the object does not constitute a search within the meaning of the Fourth Amendment, regardless of whether the observation is made by a police officer or private citizen.

*State v. Harriman*, 467 A.2d 745, 748 (Me. 1983) (citations omitted).

[¶40]   Here, the trial court found that McNaughton voluntarily accompanied officers to the Lewiston Police Department bearing "what appeared to be fresh injuries to his face and neck area as well as his hands. These injuries were clearly visible to the detectives . . . ."  The court's findings are supported by the evidence in the suppression record.  The detectives' viewing of these observable injuries therefore did not constitute a "search" for Fourth Amendment purposes, and "the observation [was] lawful without the

22

necessity of establishing either pre-existing probable cause or the existence of a search warrant or one of the traditional exceptions to the warrant requirement."[10]  1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.2(a) at 600 (5th ed. 2012); *see Harriman*, 467 A.2d at 748.  Where there was no search, it was permissible for the officers to record McNaughton's publicly-viewable injuries by taking photographs of them, just as it was permissible for them to videotape the interview.  *See* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.2(a) at 600 n.16; *State v. Marini*, 638 A.2d 507, 514 (R.I. 1994) (holding that no Fourth Amendment violation occurred when police recorded the defendant's confession without a warrant); *State v. Dickerson*, 313 N.W.2d 526, 532 (Iowa 1981) (concluding that no Fourth Amendment violation occurred when police photographed premises open to public view because "[t]he camera simply recorded what the officers saw").

---

[10]  Circumstances such as these, where "an observation is made by a police officer without a prior physical intrusion into a constitutionally protected area," are often confusingly described as implicating the "plain view" doctrine.  1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.2(a) at 599 (5th ed. 2012); *see State v. Schueler*, 488 A.2d 481, 483 (Me. 1985); *State v. Harriman*, 467 A.2d 745, 749 & n.4 (Me. 1983); *see also Scales v. State*, 284 A.2d 45, 47 n.1 (Md. Ct. Spec. App. 1971).

2. Photographs of Injuries Covered by Clothing

[¶41]  McNaughton also takes issue with the court's decision not to suppress photographs that the detectives took of injuries that were not visible until he partially removed his clothing.  The analysis is different for these photographs because it was reasonable for McNaughton to expect that those injuries would remain private.  *See Horton v. California*, 496 U.S. 128, 133 (1990) ("A search compromises the individual interest in privacy."); *Katz*, 389 U.S. at 351.

[¶42]  Evidence obtained as a result of an unreasonable search or seizure is not admissible at trial.  S*ee, e.g.*, *State v. Drown*, 2007 ME 142, ¶ 7, 937 A.2d 157.  A warrant is generally required for searches and seizures to be considered "reasonable" for Fourth Amendment purposes, *see* U.S. Const. amend. IV, but warrantless searches and seizures are permitted in some circumstances, *see Drown*, 2007 ME 142, ¶ 7, 937 A.2d 157.  One such exception exists when there are "exigent circumstances"; i.e., "when there is adequate probable cause for the seizure and insufficient time for the police to obtain a warrant."  *State v. Alley*, 2004 ME 10, ¶ 15, 841 A.2d 803.  Once a search is justified by a warrant or some exception to the warrant requirement, pursuant to the "plain view" doctrine, officers may seize objects that come

into plain view during the course of a lawful search and whose "incriminating character" is "immediately apparent," and evidence resulting from that seizure will not be subject to the exclusionary rule. *Horton*, 496 U.S. at 136-41; *see Coolidge v. New Hampshire*, 403 U.S. 443, 465-71 (1971); *Drown*, 2007 ME 142, ¶ 7, 937 A.2d 157; *Alley*, 2004 ME 10, ¶ 15, 841 A.2d 803; *Harriman*, 467 A.2d at 748-49 & n.3.

[¶43]  In this case, the trial court found that by the time the detectives collected McNaughton's clothing and photographed his injuries, they had received information that he was responsible for Parent's murder.[11]  They also observed fresh scratch marks on his face, neck, and hands.  In addition, McNaughton had given the detectives reason to believe that he had been wearing the same clothes when the murder took place.  This was sufficient information to give rise to probable cause to believe that McNaughton's clothing contained evidence of a crime, such as DNA.[12]  *See State v. Martin*, 2015 ME 91, ¶ 10, 120 A.3d 113; *State v. Sapiel*, 432 A.2d 1262, 1267

---

[11]  Although there was conflicting evidence regarding the precise details of what information the officers received and when, we have examined the record and are satisfied that it contains sufficient evidence to support the court's finding.

[12]  Although the court did not use the phrase "probable cause," its findings, which are supported by competent evidence in the record, are sufficient to support that determination.  *See State v. Libby*, 453 A.2d 481, 485 (Me. 1982) ("In determining the existence of probable cause to search, . . . [t]he record must support by a preponderance of the evidence that the officers had knowledge of facts sufficient to justify the ultimate conclusion that probable cause existed.").

(Me. 1981) ("A reasonable belief is the essence of probable cause." (quotation marks omitted)).

[¶44] The record also supports the court's determination that exigent circumstances existed because it was objectively reasonable for the police to believe that the interview would end before they could procure a warrant, and McNaughton told them that he was planning to leave for Massachusetts the following morning. Evidence contained on McNaughton's clothing could be lost or destroyed if McNaughton left the police station.[13] *See United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995) ("The exigent circumstances inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." (quotation marks omitted)); *Alley*, 2004 ME 10, ¶¶ 16-17, 841 A.2d 803; *State v. Schueler*, 488 A.2d 481, 482-83 (Me. 1985). Finally, having a lawful justification for the seizure of McNaughton's clothing, the detectives were also justified in collecting evidence that appeared in plain view during that seizure, including by photographing injuries that had previously been covered by McNaughton's

---

[13]    As discussed above, in analyzing McNaughton's Fifth Amendment challenges, the court determined that the first interview "became custodial," concluding that at some point during the interview, a reasonable person standing in McNaughton's shoes would no longer have felt "at liberty to terminate the interrogation." That is not inconsistent with its determination, in analyzing this Fourth Amendment challenge, that exigent circumstances justified the seizure of McNaughton's clothing given that the detectives repeatedly told McNaughton that he was not under arrest and could leave at any time, and that he did in fact leave about two hours after questioning began, telling the detectives that he planned to leave the state in the morning.

shirts. The court therefore did not err when it denied McNaughton's motion to suppress the photographs of his injuries.

C.     Motion for New Trial

[¶45]     Finally, McNaughton argues that the State knowingly or recklessly presented perjured testimony at trial, depriving him of a fair trial. "We review the trial court's decision on a motion for a new trial for an abuse of discretion and any findings underlying its decision for clear error." *State v. Daluz*, 2016 ME 102, ¶ 44, 143 A.3d 800.

[¶46]     As the State argues, McNaughton cannot succeed in his contention that the court abused its discretion when it rejected his argument relating to allegedly perjured testimony. McNaughton's argument is essentially identical to the one we addressed at length recently in True's appeal. *See State v. True*, 2017 ME 2, ¶¶ 16-22, 153 A.3d 106.

> As a threshold matter, a defendant must satisfy the basic and fundamental burden of demonstrating that the information delivered at trial was perjured—not merely inconsistent with other evidence or previous testimony. A showing that trial testimony is inconsistent with other testimony or evidence does not, standing alone, demonstrate that evidence presented to the fact-finder contained intentional inaccuracies or that there had been a knowing use of false testimony. Such inconsistencies present issues of credibility and call for the weighing of conflicting or inconsistent evidence—a task that falls solidly within the province of the jury as the fact-finder.

*Id.* ¶ 19 (citations omitted). Based on this principle, we do not disturb the court's denial of McNaughton's motion for a new trial.

The entry is:

Judgment affirmed.

---

Verne E. Paradie, Jr., Esq. (orally), Paradie, Sherman, Walker & Worden, Lewiston, for appellant Michael R. McNaughton

Janet T. Mills, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Androscoggin County Superior Court docket number CR-2013-458
FOR CLERK REFERENCE ONLY