STATE OF MAINE                                    UNIFIED CRIMINAL DOCKET
WALDO, ss.                                        DKT. NO. WALCD-CR-16-915

                                    )
STATE OF MAINE,                     )
                                    )
                                    )       **ORDER GRANTING DEFENDANT'S**
v.                                  )       **MOTION TO SUPPRESS**
                                    )
ANDREW SOUSA                        )

Defendant filed a Motion to Suppress contending, among other issues, that he did not execute a knowing and intelligent *Miranda* waiver and that statements he made to the police were involuntary. A hearing was held before the Court on October 23, 2017. At the hearing, the trooper involved, Thomas Bureau of the Maine State Police, and Dr. Robert Riley,[1] a clinical neuropsychologist and forensic examiner, provided testimony for the Court's consideration. The video of Trooper Bureau's interrogations of the Defendant was also admitted into evidence. Both the State and the Defendant provided the Court with post-hearing memoranda.

FINDINGS OF FACT

Based upon the testimony and evidence presented at the hearing, the Court finds the following:

In November 2016, Defendant was experiencing serious mental health problems, which led to his parents seeking to have him admitted to the Acadia Hospital in Bangor. At the suppression hearing, testimony was introduced through Dr. Riley that indicated Defendant had been admitted to Acadia Hospital from November 2 through November 10, when he was then released. The staff at Acadia Hospital determined Defendant was suffering from schizophrenia spectrum psychotic disorder during this stay, which included delusional religious statements.

_____

[1] At the beginning of the suppression hearing, the State stipulated to Dr. Riley's status as an expert.

1

Though he was released on November 10, he was quickly readmitted on November 12.

During this second stay, he continued to be diagnosed with schizophrenia spectrum psychotic disorder, and Dr. Riley testified that the hospital records showed Defendant attempted to microwave his clothing. Dr. Riley also indicated the hospital deemed Defendant to fit the qualifications for involuntary commitment during this second stay. It was during this stay that Defendant escaped from Acadia Hospital on November 15, and began his journey from Bangor to Brooks, which led to the events for which Defendant is being prosecuted by the State. The evidence from medical records reviewed by Dr. Riley suggests that Defendant continued to experience delusions even after he was returned to Acadia Hospital on November 18.

On the evening of November 17, Trooper Thomas Bureau of the Maine State Police was working his normal patrol when he was dispatched to 65 Arsenault Road in Brooks, Maine. Dispatch informed Trooper Bureau that they had received a call from a woman at that address who reported her son had arrived at home, after escaping from Acadia Hospital in Bangor, with no clothes on, and was "not in his right mind." That woman was Catherine Sousa, Defendant's mother. By the time Trooper Bureau arrived at the Sousa household, he verified Defendant had in fact escaped from Acadia Hospital. Because of this and because Trooper Bureau knew Defendant had traveled from Bangor to Brooks in the middle of November, possibly with no clothes on, he made sure Emergency Medical Services ("EMS") would be present at the scene to evaluate Defendant for injuries. Trooper Bureau testified at the suppression hearing that he was aware people had described Defendant as being in the middle of a mental health crisis.

When Trooper Bureau, the sole law enforcement officer at the scene, arrived at the Sousa household, he was greeted at the door by Edward Sousa, Defendant's father. Catherine Sousa was also present. Mr. Sousa let Trooper Bureau into the house where Trooper Bureau found Defendant

2

sitting naked in a chair in the back corner of a room, wrapped only in a blanket or a comforter. Trooper Bureau asked Defendant to put some clothes on. While EMS was evaluating Defendant, Trooper Bureau returned to his cruiser and learned Detective Joel Nadeau from the Bangor Police Department wanted to speak with Defendant. Trooper Bureau learned from Detective Nadeau that Defendant was a person of interest for an incident that occurred in Bangor on November 15, the same evening Defendant had escaped from Acadia Hospital. Trooper Bureau testified that Defendant had informed Trooper Bureau that Defendant had not been taking all of his prescribed medications at Acadia Hospital, though Trooper Bureau was not aware what medications Defendant had been prescribed at the time. Defendant also informed Trooper Bureau that he had walked the thirty-five miles from Bangor to Brooks while naked in the middle of November, which caused Trooper Bureau think that "there was definitely something different there" in relation to Defendant's mental health state.

Once EMS cleared Defendant medically, Trooper Bureau told Defendant he needed to be transported to Eastern Maine Medical Center in Bangor for an evaluation, which Trooper Bureau understood to be a mental health evaluation. Trooper Bureau handcuffed Defendant, but before securing Defendant in the police cruiser, Trooper Bureau allowed Defendant to hug his parents.

After Defendant said goodbye to his parents, Trooper Bureau placed Defendant, still handcuffed, in the front seat of the police cruiser. Trooper Bureau then turned on the audio and video recording devices in his cruiser. While the cruiser was still parked in the driveway at the Sousa household, Trooper Bureau told Defendant that because "you're not free to leave, I'm going to read you your rights," and proceeded to read Defendant his *Miranda* rights. Trooper Bureau then asked if Defendant would answer some questions, but Defendant responded "I think not, probably not." Because of this response, Trooper Bureau immediately stopped questioning

3

Defendant and testified at the suppression hearing that he believed Defendant had invoked his right to remain silent. Trooper Bureau did follow up Defendant's initial refusal to answer questions by saying "if you change your mind, let me know. I'll read it to you again, if you want to talk . . . ." Defendant said "thank you," but ceased speaking to Trooper Bureau after that. Trooper Bureau stopped the audio and video recording shortly after Defendant's refusal to answer questions, and they started driving to Bangor.

At the suppression hearing, Trooper Bureau testified that five to seven minutes had passed when Defendant attempted to engage Trooper Bureau in conversation. Trooper Bureau informed Defendant he had invoked his right to remain silent and that Trooper Bureau could not speak with him because of this. Defendant then told Trooper Bureau that he had changed his mind and he wanted to talk. This caused Trooper Bureau to find a safe location off the road where he could re-read Defendant his *Miranda* rights. The cruiser video then resumes and shows the cruiser pulling into the Jackson Fire Department parking lot. Once in the parking lot, Trooper Bureau asked Defendant, "so now you've changed your mind, right?" Defendant responded affirmatively.

Trooper Bureau then informed Defendant of the following: he had the right to remain silent; anything he said could and would be used against him in a court of law; he had the right to the advice of a lawyer before questioning and to the presence of a lawyer during questioning; if he could not afford a lawyer, one would be provided to him for free before any questioning if he desired; and if he started answering questions, he had the right to stop at any time until he could talk to a lawyer. After Trooper Bureau informed Defendant of each right he possessed, he asked Defendant if Defendant understood that right and Defendant affirmatively responded each time with "yeah" or "yes" and a nod. Then Trooper Bureau asked Defendant if Defendant wished to answer questions, and Defendant answered with a "yeah" and a nod. Before asking Defendant any

4

questions, Trooper Bureau clarified with Defendant that Defendant had originally invoked his rights and asked Defendant if Trooper Bureau was correct in understanding Defendant changed his mind and was waiving his right to remain silent. Defendant responded affirmatively, and Trooper Bureau then asked Defendant if he was coerced or forced into changing his mind, to which Defendant responded "no." Following this, Defendant proceeded to implicate himself in a number of criminal acts.

He told Trooper Bureau about his failed attempt to steal a car from a woman, his subsequent successful attempt to steal a truck that was unlocked and had the keys inside. Defendant explained to Trooper Bureau that he drove the truck for some distance and then ditched it on the Loop Road in Searsport. Trooper Bureau was later able to confirm the accuracy of much of what Defendant told him.

In the midst of making these incriminating statements, Defendant explained his motivation in eloping from Acadia Hospital was that he had to save his cat, Juniper. In follow up, Trooper Bureau asked where Juniper was, and Defendant said, "she's dead right now, I think, but, I don't know. Maybe I've already saved her." Defendant then described how she "physically perished" a few weeks prior, but that he had been trying to figure out a way to resurrect her spirit ever since. Later in Trooper Bureau's questioning, Defendant detailed how he burned his parents barn down with kerosene because he wanted to rid himself of the possessions that were "weighing him down." At the suppression hearing, Trooper Bureau testified that after the video ended, Defendant continued to talk. Trooper Bureau elaborated that Defendant described cutting a different cat's throat with a knife he had sharpened, and then told Trooper Bureau he did all of this because he was "Jesus Christ, Son of God."

Based on his review of the medical records from Defendant's sojourns at Acadia Hospital

5

in November 2016, Dr. Riley opined that he believed Defendant was experiencing a significant mental health crisis in November 2016, which was characterized by detailed and complex psychotic symptoms, including delusions. More specifically, he described Defendant's interactions with Trooper Bureau as being characterized by psychotic thought processes, including the relatively quick decision to change his mind and speak with Trooper Bureau. Dr. Riley testified it was possible for Defendant to appear to be acting rationally but still be subject to psychotic beliefs. In addition to reviewing the medical records from Defendant's stays at Acadia in November 2016, Dr. Riley met with Defendant a number of months later in March 2017. During that interview, Dr. Riley found Defendant to exhibit symptoms consistent with those reflected in the medical records from November 2016. When Dr. Riley met with Defendant, he asked Defendant about his interactions with Trooper Bureau. Defendant explained to Dr. Riley that he changed his mind and decided to speak with Trooper Bureau because not doing so would make him a "filthy wedding garment," which Dr. Riley believed to be consistent with other religious themes Defendant expressed in November 2016.

LEGAL CONCLUSIONS

The resolution of this Motion requires an application of the facts surrounding Trooper Bureau's interrogations of Defendant to a familiar constitutional doctrine, that which proscribes the government from introducing into evidence at trial a defendant's statements if made involuntarily. There are a number of interrelated issues that must be addressed before reaching the ultimate voluntariness issue.

I. Custodial Interrogation, Defendant's Invocation of the Right to Remain Silent, and Whether Trooper Bureau "Scrupulously Honored" Defendant's Invocation of His Right to Remain Silent.

6

The State concedes—and the Court also finds—that Defendant was subject to custodial interrogation, which means the prophylactic rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), applies. *See State v. Ames*, 2017 ME 27, ¶ 12, 155 A.3d 881. Defendant was handcuffed, placed in the front seat of Trooper Bureau's police cruiser to be transported to Bangor for a mental health evaluation, and told by Trooper Bureau that Trooper Bureau wanted to ask Defendant some questions. Trooper Bureau even told Defendant that because "you're not free to leave, I'm going to read you your rights," and proceeded to read Defendant his *Miranda* rights. This qualifies as custodial interrogation for the purposes of *Miranda*, *see State v. Jones*, 2012 ME 126, ¶ 22, 55 A.3d 432, and Trooper Bureau properly informed Defendant of his *Miranda* rights and received an affirmative response to each during the initial attempt to question Defendant.

Defendant also unambiguously invoked his right to remain silent after Trooper Bureau's first reading of the *Miranda* warnings. "[I]n order to assert one's right to 'cut off questioning' an individual must articulate a desire 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement' to be" an invocation of the right to remain silent. *State v. King*, 1998 ME 60, ¶ 9, 708 A.2d 1014 (quoting *Davis v. U.S.*, 512 U.S. 452, 459 (1994)). Defendant seemed to equivocate when he stated "I think not, probably not" after Trooper Bureau asked if Defendant wanted to answer questions. However, Trooper Bureau stopped questioning Defendant and also testified at the suppression hearing that Defendant had invoked his rights.[2] Thus, it is clear Trooper Bureau understood Defendant's statement to be an invocation of his right to remain silent.

Once Defendant invoked his right to remain silent, his later waiver cannot be held valid

---

[2] There was some confusion at the suppression hearing over whether or not Defendant invoked his right to counsel, but the video of the interaction shows Defendant's invocation was in response to answering questions. He did not unambiguously invoke his right to counsel.

unless Trooper Bureau scrupulously honored Defendant's invocation. *See State v. Grant*, 2008 ME 14, ¶ 41, 939 A.2d 93. This premise is grounded in the Supreme Court's decision in *Michigan v. Mosley*, 423 U.S. 96 (1975). The Law Court distilled the Supreme Court's holding to a four-fact test for determining whether an invocation was scrupulously honored; those four factors are: "'(1) whether police immediately cease the interrogation when the [suspect] invokes the right to remain silent; (2) whether a significant amount of time passes before questioning is resumed; (3) whether fresh *Miranda* warnings are provided; and (4) whether the later "interrogation is restricted to matters distinct from the former."'" *State v. Johansen*, 2014 ME 132, ¶ 14, 105 A.3d 433 (quoting *Grant*, 2008 ME 14, ¶ 42, 939 A.2d 93 and *State v. Rossignol*, 627 A.2d 524, 527 (Me. 1993)). With these four factors in mind, the Court concludes Trooper Bureau scrupulously honored Defendant's invocation of his right to remain silent.

Trooper Bureau did follow up Defendant's initial invocation of his right to remain silent by saying "if you change your mind, let me know. I'll read it to you again, if you want to talk . . . ." However, this was not express questioning nor was it the functional equivalent. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 300-01 (noting "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect"). Defendant responded to Trooper Bureau's statement by saying "thank you." The statements did not elicit an incriminating response, and it was not until five to seven minutes later when Defendant indicated he wished to speak to Trooper Bureau. Trooper Bureau then gave Defendant fresh *Miranda* warnings before Defendant made any incriminating statements. Further, Trooper Bureau's initial interrogation did not involve specific topics; instead, he told Defendant that he wanted to ask Defendant some questions, but Defendant invoked his right to remain silent before

8

any specific matters were discussed.

Accordingly, three of the four factors cut in favor of a conclusion that Trooper Bureau scrupulously honored Defendant's invocation of his right to remain silent. The weight of the factor that cuts in Defendant's favor—the short amount of time that passed between the first attempted interrogation and the second interrogation—is lessened by Defendant's role in initiating that second interrogation. Thus, the Court concludes Trooper Bureau scrupulously honored Defendant's invocation after the first attempted interrogation.

For the foregoing reasons, the Court concludes Defendant was subject to custodial interrogation for purposes of *Miranda*, Defendant initially invoked his right to remain silent unambiguously, and Trooper Bureau scrupulously honored Defendant's invocation between the time of Defendant's invocation and his later decision to speak with Trooper Bureau.

II. Whether Defendant Knowingly and Intelligently Waived His *Miranda* Rights, and Whether Defendant's Incriminating Statements to Trooper Bureau Were Voluntary.

Defendant has challenged the validity of his *Miranda* waiver and the voluntariness of his incriminating statements to Trooper Bureau. Maine law places different burdens of proof on the State to show a waiver of *Miranda* rights as compared to the voluntariness of a confession when the State intends to introduce into evidence a suspect's statements arising from custodial interrogation. With respect to waiver, the State must demonstrate by a preponderance of the evidence that law enforcement properly gave *Miranda* warnings and that the suspect then waived his *Miranda* rights. *State v. Figueroa*, 2016 ME 133, ¶ 14, 146 A.3d 427. In contrast, the State has the higher burden of proving beyond a reasonable doubt that the ensuing statements were voluntary. *State v. McNaughton*, 2017 ME 173, ¶ 34, 168 A.3d 807.

A. *Defendant's Waiver of* Miranda *Rights.*

9

The "inherently compelling pressures" of custodial interrogation are of such a nature that someone subjected to custodial interrogation is at risk of being coerced to confess. *Miranda*, 384 U.S. at 467. Because of this, the Supreme Court mandated that suspects subjected to custodial interrogation must be apprised of their constitutional rights and those rights must be fully honored in order to prevent confessions coerced by the compelling pressures of custodial interrogation. *Id.* When a suspect invokes the right to remain silent after the police recite an effective equivalent of the *Miranda* warnings and then later gives a statement, the State must "demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination . . . ." *Id.* at 475.

The common shorthand for what the State must show when intending to use statements made after *Miranda* warnings is a showing of a "knowing, intelligent, and voluntary waiver of *Miranda* rights . . . ." *State v. Lockhart*, 2003 ME 108, ¶ 21, 830 A.2d 433 (quoting *State v. Coombs*, 1998 ME 1, ¶ 15, 704 A.2d 387). However, it is important to note that "[w]hether a statement was voluntary, and whether it arose from a knowing and intelligent waiver, are two separate inquires." *Grant*, 2008 ME 14, ¶ 22 n.4, 939 A.2d 93 (citing *Edwards v. Ariz.*, 451 U.S. 477, 484 (1981)); *see also State v. Shanahan*, 404 A.2d 975, 979 n.5 (Me. 1979). Thus, while the waiver and the incriminating statements might occur simultaneously in real time, the validity of the waiver and the voluntariness of the statements each warrant separate dissection. With respect to showing a knowing and intelligent waiver, the State must demonstrate that either through words or conduct, the accused made "an intentional relinquishment or abandonment of known rights." *Lockhart*, 2003 ME 108, ¶ 21, 830 A.2d 433 (citing *Coombs*, 1998 ME 1, ¶¶ 15-16, 704 A.2d 387). "Whether a defendant has validly waived her *Miranda* rights depends on the factual circumstances of the interrogation." *Coombs*, 1998 ME 1, ¶ 13, 704 A.2d 387 (citing *State v. DeLong*, 505 A.2d

10

803, 808 (Me. 1986)).

The Supreme Court has articulated a two-prong approach for analyzing waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). In order to effectuate a waiver, the law requires only that a suspect "understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." *U.S. v. Ruiz*, 536 U.S. 622, 629 (2002).

The Court concludes the State proved by a preponderance of the evidence that Defendant received sufficient *Miranda* warnings and knowingly and intelligently waived his rights after a second recital prompted by his offer to speak with Trooper Bureau. As the Court will review in the next section, there were serious concerns with Defendant's mental state in the period surrounding his statements to Trooper Bureau. However, in the context of a knowing and intelligent waiver, the testimony and the video of the interrogations demonstrate that Defendant was not coerced into waiving his rights, and he displayed the requisite level of comprehension.

The cruiser video of Defendant's interactions with Trooper Bureau shows Trooper Bureau did not intimidate, coerce, or deceive Defendant in any way about waiving his *Miranda* rights. While there is a gap in the video between Defendant's invocation of his right to remain silent and his subsequent waiver of his rights, Trooper Bureau testified that he did not threaten Defendant or

11

offer Defendant anything. Indeed, Trooper Bureau testified that there was no conversation in that five- to seven-minute gap until Defendant engaged Trooper Bureau.

However, Trooper Bureau informed Defendant that because Defendant had invoked his right, Trooper Bureau could not converse with Defendant. Trooper Bureau testified it was at that point Defendant told Trooper Bureau that Defendant had changed his mind and wanted to talk. This caused Trooper Bureau to find a safe location off the road where he could re-read Defendant his *Miranda* rights. It was at this point where the cruiser video resumed and shows the cruiser pulling into the Jackson Fire Department parking lot. Trooper Bureau was a believable and credible witness, especially in light of his testimony being confirmed by the video, and the Court has no reason to doubt Trooper Bureau's recounting of the five to seven minutes that passed off video.

Once in the parking lot, Trooper Bureau asked Defendant, "so now you've changed your mind, right?" Defendant responded affirmatively. Trooper Bureau then informed Defendant of the following: he had the right to remain silent; anything he said could and would be used against him in a court of law; he had the right to the advice of a lawyer before questioning and to the presence of a lawyer during questioning; if he could not afford a lawyer, one would be provided to him for free before any questioning if he desired; and if he started answering questions, he had the right to stop at any time until he could talk to a lawyer. After Trooper Bureau informed Defendant of each right he possessed, he asked Defendant if Defendant understood that right and Defendant affirmatively responded each time with "yeah" or "yes" and a nod. Then Trooper Bureau asked Defendant if Defendant wished to answer questions, and Defendant answered with a "yeah" and a nod. Before asking Defendant any questions, Trooper Bureau clarified with

12

Defendant that Defendant had originally invoked his rights[3] and asked Defendant if Trooper Bureau was correct in understanding Defendant changed his mind and was waiving his right to remain silent. Defendant responded affirmatively, and Trooper Bureau then asked Defendant if he was coerced or forced into changing his mind, to which Defendant responded "no."

Neither Trooper Bureau's testimony at the suppression hearing nor the cruiser video show any evidence of coercion, deception, or intimidation on Trooper Bureau's part, and instead reflect the opposite. Before asking Defendant any questions, Trooper Bureau deliberately took the precautionary steps of confirming with Defendant that he changed his mind and was comfortable with waiving his right and speaking with Trooper Bureau. Trooper Bureau interacted with Defendant in a soft, compassionate manner. Considering the totality of the circumstances discussed above, it is clear Defendant intentionally relinquished or abandoned his known rights. This conclusion is buttressed by the fact that Defendant had just invoked his right to remain silent and was stopped by Trooper Bureau from further conversation because Defendant had invoked that right to remain silent. Thus, Defendant was presented with a situation where the results of his invocation immediately revealed themselves. Defendant still indicated he wished to speak, and Trooper Bureau then re-read Defendant his rights. Defendant responded affirmatively to each, and clearly indicated he wished to speak with Trooper Bureau. The Court concludes the State proved by a preponderance of the evidence that Defendant was properly read his *Miranda* rights—twice—and knowingly and intelligently waived those rights upon the second reading.

*B. The Voluntariness Analysis with Respect to Defendant's Statements to Trooper Bureau.*

In Maine, the voluntariness—or lack thereof—of confessions is governed by two related, but distinct, areas of constitutional law: the privilege against self-incrimination as provided by the

---

[3] Trooper Bureau refers to "rights," but the only right Defendant had invoked was the right to remain silent. Defendant had not invoked the right to counsel.

13

Fifth Amendment to the U.S. Constitution and its analog in Article 1, § 6 of the Maine Constitution, and the due process requirement supplied by the Fourteenth Amendment to the U.S. Constitution and its analog in Article 1, § 6-A of the Maine Constitution.

However, the distinction between the privilege against self-incrimination and the due process clause in Maine has not always been straightforward. In *State v. Hunt*, the Law Court clarified that "[t]here is a distinction between those statements that must be excluded pursuant to the Fifth Amendment because they are the product of compulsion, and those statements that must be excluded because their admission would otherwise create an injustice." 2016 ME 172, ¶ 19, 151 A.3d 911. It appears that some of the confusion in Maine related to prior indications of divergence under the Maine Constitution's privilege against self-incrimination from Supreme Court precedent that required coercive police conduct to find a confession involuntary pursuant to the Fifth Amendment privilege against self-incrimination.

Coercive police conduct has not always been a necessary element in Maine for finding a confession to be involuntary pursuant to the privilege against self-incrimination embodied in Article 1, § 6. *See, e.g., State v. Rees*, 2000 ME 55, 748 A.2d 976 (holding under Article 1, § 6 of the Maine Constitution that the defendant's statements to the police were involuntary solely on the basis of defendant's dementia, despite the absence of coercive police conduct). Chief Justice Saufley (an associate Justice at the time) dissented from the majority in *Rees* and concluded that the historical underpinnings of the privilege required police compulsion or coercion in order to find a confession involuntary pursuant to the Fifth Amendment and Article 1, § 6 of the Maine Constitution. She argued the Article 1, § 6 privilege against self-incrimination developed based on the same governmental compulsion concerns as the Fifth Amendment. *Id.* ¶¶ 27-32. She distinguished this from a due process analysis, which does not hinge on compulsion but instead

14

views the State's actions under the lens of the totality of the circumstances. *Id.* ¶ 36. Her concern in *Rees* was that the majority merged the voluntariness of a confession analysis under the privilege against self-incrimination with the voluntariness of a confession analysis under due process principles. *Id.* ¶ 12.

The *Hunt* Court cited approvingly to Chief Justice Saufley's dissent when it explained, "'[w]here the Fifth Amendment analysis seeks to determine whether the defendant's confession was compelled, a due process analysis asks whether the State has obtained the confession in a manner that comports with due process.'"[4] *Hunt*, 2016 ME 172, ¶ 19, 151 A.3d 911 (quoting *Rees*, 2000 ME 55, ¶ 36, 748 A.2d 976 (Saufley, J., dissenting) (internal quotation marks omitted)). In other words, both constitutional doctrines serve as a means for analyzing the voluntariness of a confession, but the process in analyzing under each differs.

Here, Defendant has raised both the privilege against self-incrimination (as grounded in both the Fifth Amendment and Article 1, § 6) and the due process clause (as grounded in both the Fourteenth Amendment and Article 1, § 6-A) as grounds for excluding his statements to Trooper Bureau. Although Defendant raises the privilege against self-incrimination as a basis for suppression, there is no evidence in the suppression record that would show Trooper Bureau compelled a confession out of Defendant; instead, the record demonstrates Defendant's mental state is the major factor in the voluntariness calculation. *Cf. Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (internal quotation marks omitted) ("the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official

---

[4] Notably, the Law Court in *Hunt* did not explicitly state compulsion is a necessary element under *Article 1, § 6's privilege against self-incrimination*—only noting it was necessary under the Fifth Amendment. Stating so would appear to conflict with the holding in *Rees*. However, the import of the decision seems to be that confessions not compelled in violation of the privilege against self-incrimination are accorded the due process totality of the circumstances analysis. This appears to be the proper analysis for circumstances such as these where a defendant's mental health status is a major factor in the voluntariness determination.

15

coercion."); *Hunt*, 2016 ME 172, ¶ 19, 151 A.3d 911 (noting that when a confession was not "'forced' out of [the defendant], we examine whether admission of his confession violated his right to due process.").

While Defendant was subject to custodial interrogation—which, as discussed in the *Miranda* decision, carries with it inherently coercive pressures—Trooper Bureau gave Defendant the prophylactic warnings mandated by *Miranda*. Defendant initially invoked his right to remain silent, then subsequently waived it after a second recital of the *Miranda* warnings. There is no evidence of other forms of external police coercion. Thus, the compulsion necessary to exclude the confession because of the privilege against self-incrimination was not present during Trooper Bureau's interrogation of Defendant. Instead, Defendant's confession must be analyzed under the broader due process calculus.

"The Due Process Clause . . . prohibits deprivations of life, liberty, or property without fundamental fairness through governmental conduct that offends the community's sense of justice, decency and fair play." *State v. McConkie*, 2000 ME 158, ¶ 9, 755 A.2d 1075 (internal quotation marks omitted). Under the due process analysis, a "confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair." *State v. Mikulewicz*, 462 A.2d 497, 501 (Me. 1983). "[T]he voluntariness requirement gives effect to three overlapping but conceptually distinct values: (1) it discourages objectionable police practices; (2) it protects the mental freedom of the individual; and (3) it preserves a quality of fundamental fairness in the criminal justice system." *Id.* at 500. As the Law Court has made clear, "a confession is involuntary when it is made under circumstances that offend one of these fundamental values of social policy and constitutional law." *Hunt*, 2016 ME 172, ¶ 20, 151 A.3d 911. There are many factors that

16

play into the due process voluntariness analysis.

It is not focused solely on whether the confession resulted from police compulsion, but instead is focused more broadly on the State's actions in securing the confession. *McConkie*, 2000 ME 158, ¶ 9 n.3, 755 A.2d 1075. In making this determination, a court must consider the totality of the circumstances, which may include

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of Miranda warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*McNaughton*, 2017 ME 173, ¶ 34, 168 A.3d 807 (citing *State v. George*, 2012 ME 64, ¶ 21, 52 A.3d 903).

Based on the factual findings, and the considerations in the totality of the circumstances analysis, the Court finds the State has not proved, beyond a reasonable, that Defendant's confession was voluntary. It is important to note that in making this finding, the Court is not attributing any malevolent intent to Trooper Bureau in his interactions with Defendant. Trooper Bureau interacted with Defendant in a calm, cordial, and professional manner, and respected Defendant's initial invocation of his right to remain silent. The concern in this case is the effect a law enforcement officer's interrogation of an individual—who was subject to the same mental health issues as Defendant—would have on that individual when that law enforcement officer knew of these mental health concerns and, more importantly, the impact such would have on the voluntariness of the individual's statements. As the Law Court cautioned, the totality of the circumstances analysis "need[s] to consider law enforcement's actions vis-à-vis each defendant's characteristics . . . ." *Hunt*, 2016 ME 172, ¶ 39, 151 A.3d 911. This Defendant's mental health status as of November 2016 weighs heavily in the totality of the circumstances.

17

There are a number of factors that would normally weigh in favor of voluntariness that are present: the interrogation was short—approximately thirty minutes between the first reading of *Miranda* and the end of the cruiser video—in comparison to many marathon interrogations that lead to suspects caving after time; Trooper Bureau made sure to inform Defendant of his *Miranda* rights twice and took precautions to ensure Defendant was comfortable waiving them after the second reading; Trooper Bureau was the only officer involved; Trooper Bureau was not persistent and instead respected Defendant's initial invocation of his right to remain silent; and Trooper Bureau did not make any threats, promises, or inducements to Defendant, or attempt to use any police trickery. Normally, such circumstances would point to a finding of voluntariness.

However, in this case there is one overriding issue which affects the totality of the circumstances analysis: Defendant's mental health and how it relates to his conduct during his interactions with Trooper Bureau. At the hearing, testimony was introduced through Dr. Riley that indicated Defendant had been admitted to Acadia Hospital from November 2 through November 10, when he was released. The hospital's records reflected he had been admitted because his parents were concerned about his mental state, and the hospital determined he was suffering from schizophrenia spectrum psychotic disorder during this stay. His mental state included delusional religious statements. Though he was released on November 10, he was readmitted on November 12.

During this second stay, he continued to be diagnosed with schizophrenia spectrum psychotic disorder, and Dr. Riley testified that the hospital records showed Defendant attempted to microwave his clothing. Dr. Riley also indicated the hospital deemed Defendant to fit the qualifications for involuntary commitment during this second stay. It was during this stay that Defendant escaped from Acadia and began his journey from Bangor to Brooks, which led to the

18

events for which Defendant is being prosecuted by the State. Based on his review of the records, Dr. Riley opined that he believed Defendant was experiencing a significant mental health crisis in November 2016 which was characterized by detailed and complex psychotic symptoms, including delusions. More specifically, he described Defendant's interactions with Trooper Bureau as being characterized by psychotic thought processes. Dr. Riley testified it was possible for Defendant to appear to be acting rationally but still be subject to psychotic beliefs. The evidence from medical records reviewed by Dr. Riley suggests Defendant continued to experience delusions even after he was returned to Acadia Hospital on November 18.

The difficulty in this case arises from the lucidity with which Defendant engages Trooper Bureau during much of the interrogation. Defendant appears to understand what he was saying and, indeed, much of what he told Trooper Bureau, including his attempts to steal keys from a woman and later steal a truck with the keys left in them, was independently corroborated. However, interspersed within these seemingly lucid statements, Defendant makes a number of peculiar comments which cause alarm when considered in conjunction with the mental health diagnoses made by the hospital from which he escaped. Some of these statements warrant further discussion.

In the midst of making the statements the State seeks to utilize as evidence in this case, Defendant explained his motivation in eloping from Acadia Hospital was that he had to save his cat, Juniper. In follow up, Trooper Bureau asked where Juniper was, and Defendant said, "she's dead right now, I think, but, I don't know. Maybe I've already saved her." Defendant then described how she "physically perished" a few weeks prior, but that he had been trying to figure out a way to resurrect her spirit ever since. At the suppression hearing, Trooper Bureau testified that after the video ended, Defendant continued to talk. Trooper Bureau elaborated that Defendant

19

described cutting a different cat with a knife he had sharpened, and then told Trooper Bureau he did all of this because he was "Jesus Christ, Son of God." This backdrop certainly calls into question whether Defendant's decision to speak with Trooper Bureau "result[ed] from the free choice of a rational mind . . . ." *Mikulewicz*, 462 A.2d at 501. Dr. Riley's testimony about his interview with Defendant further supports questioning whether Defendant made a free choice of a rational mind.

When Dr. Riley met with Defendant in March 2017, he questioned Defendant about his interactions with Trooper Bureau. Defendant explained to Dr. Riley that he changed his mind and decided to speak with Trooper Bureau because not doing so would make him a "filthy wedding garment," which Dr. Riley believed to be consistent with other religious themes Defendant expressed during November 2016. When considering this with what Trooper Bureau knew at the time, it is difficult to conclude Defendant's confession was voluntary beyond a reasonable doubt.

As Chief Justice Saufley noted in her dissent in *Rees*, law enforcement actions not amounting to "misconduct" "may constitute an overreaching for purposes of a due process analysis, if the defendant was understood to be suffering from a physical or mental illness and the officer took advantage of that disability, however subtly, to obtain a confession." *Rees*, 2000 ME 55, ¶ 47, 748 A.2d 976 (Saufley, J., dissenting).

While Trooper Bureau did not engage in any misconduct, he did testify that he was dispatched to 65 Arsenault Road in Brooks on November 17 to respond to a situation where a woman reported her son had arrived at home, after escaping from Acadia Hospital, with no clothes on. At the time he went to the Sousa household, he knew and verified Defendant had escaped from Acadia Hospital. Trooper Bureau also testified that he knew Defendant's mother had reported Defendant as not being in his right mind. While Trooper Bureau did not know Defendant

20

had been experiencing psychosis and delusions, he did testify he was aware people had described Defendant as being in the middle of a mental health crisis. After Trooper Bureau arrived at the Sousa household and was let inside by Defendant's father, Edward Sousa, Trooper Bureau found Defendant naked in a chair in the back corner of a room, with only a blanket or comforter wrapped around him.

Trooper Bureau also acknowledged that Defendant had informed Trooper Bureau that Defendant had not been taking all of his prescribed medications, though Trooper Bureau was not aware what medications Defendant had been prescribed at the time. Upon cross-examination, Trooper Bureau conceded that "there was definitely something different there" in relation to Defendant's statement that he had walked the thirty-five miles from Bangor to Brooks while naked after escaping Acadia Hospital, and what it said about Defendant's mental health state. Further, Trooper Bureau knew Defendant was being brought to Bangor for an "evaluation," which he took to mean a "mental health evaluation."

In summary, the Defendant, who had been experiencing a serious mental health crisis in November 2016, escaped from a mental hospital and was apprehended by Trooper Bureau in a state which his mother described as not being "in his right mind." From there, Trooper Bureau handcuffed Defendant, placed him in the police cruiser, and attempted to question him. Trooper Bureau knew Defendant had just escaped from Acadia, and had claimed to have walked thirty-five miles while naked to his parents' home, had not been taking all his prescribed medications, had been described by others as being in the middle of a mental health crisis, and was being taken for a mental health evaluation. Viewed in this light, attempting to interrogate an individual in such a delicate mental state—which was later formally diagnosed to be psychosis and delusions—risks obtaining statements from someone not in a rational state of mind.

21

The Court reiterates Trooper Bureau's conduct did not amount to misconduct, nor is the Court suggesting Trooper Bureau intended to take advantage of Defendant. But the totality of the circumstances suggests Defendant was interrogated by a law enforcement officer in a period when he was diagnosed with being subject to profound delusions and psychosis. Some of Defendant's statements during the interrogation evince some of evidence of these delusions and psychosis. Because the Court must "consider law enforcement's actions vis-à-vis each defendant's characteristics," *Hunt*, 2016 ME 172, ¶ 39, 151 A.3d 911, the Court concludes the State has failed to prove, beyond a reasonable doubt, that Defendant's statements to Trooper Bureau on November 17, 2016, were voluntary. Accordingly, the Court must suppress them.

The entry is:

1. Defendant's Motion to Suppress is **GRANTED**.
2. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R.U. Crim. P. 53(a).

Dated: 1/26/18

The Hon. Robert E. Murray
Justice, Maine Superior Court

22